**In re STUART.**

No. 7544.

United States Court of Appeals for the
District of Columbia.

Decided Aug. 5, 1940.

826

Arthur G. Lambert and George L. Hart, Jr., both of Washington, D. C., for appellant.

Elwood H. Seal, Corp. Counsel, Vernon E. West, Principal Asst. Corp. Counsel, and John O'Dea, Asst. Corp. Counsel, all of Washington, D. C., for appellee.

Before STEPHENS, EDGERTON, and RUTLEDGE, Associate Justices.

STEPHENS, Associate Justice.

This appeal questions the correctness of a judgment of the Juvenile Court of the District of Columbia entered May 12, 1939, that the appellant Fairfax Stuart, a child fifteen years of age "is without adequate parental care and support," and that she be "placed under the guardianship of Mrs. Lloyd P. Shippen...." [1] The effect of the order is to displace the legal custody and

[1] It· was also ordered that the father of the child "bear full expense for her support ·pending a further hearing on June 13, 1939." But this portion of the order is the subject of no appeal by the father, and it is not questioned by the appellant.

natural guardianship of Mrs. Margaret Berry Stuart, the mother of the appellant, with whom the appellant had since her birth been living, by that of Mrs. Shippen, a person not related to the appellant.

The case arose as follows: Sometime prior to March 16, 1939, Mrs. Stuart, the mother of the appellant, procured the institution by the Corporation Counsel for the District of Columbia of an action of non-support in the Juvenile Court against her former husband, the appellant's father, Dr. Daniel D. V. Stuart. As the result of a hearing held in that case on March 16, 1939, the Juvenile Court ordered Dr. Stuart to pay $150 a month for the support of the appellant. The order was conditioned, however, upon the making of suitable arrangements for Dr. Stuart to interview his child from time to time; and the non-support case was continued, without final adjudication, until June 13, 1939, in order that these arrangements might be made. So far as the record in the instant case shows they never have been made. But in an effort to make them, the supervisor of the Adult Probation Department of the Juvenile Court, Miss Louise McDonnell, had several conversations with Mrs. Stuart and the appellant. Thereafter, on May 4, 1939, a petition in dependency signed by Miss McDonnell was filed, representing that the appellant "is without adequate parental care and support," and praying that "summons issue to said child and to the said Margaret Berry Stuart and Daniel D. V. Stuart requiring them to appear before...[the Juvenile Court] and show why said child should not be dealt with pursuant to the Juvenile Court Laws for the District of Columbia...," and praying that after a hearing the court should enter such judgment "as ... may seem meet and as will best conserve the welfare of said child." After a hearing upon this petition, held on May 12, 1939, at which Dr. Stuart, Mrs. Stuart and the appellant appeared, and after the overruling of motions by the appellant, made both at the close of the evidence for the District and at the close of all the evidence, the order appealed from was entered. We granted writ of error.

Including Miss McDonnell and Mrs. Stuart above mentioned, thirteen witnesses were called and examined. Much of the evidence had to do with Dr. Stuart's asserted failure to provide funds for the support of the appellant—an issue which had been determined against Dr. Stuart in the previous case—and with objections raised by Mrs. Stuart and the appellant to the fitness of Dr. Stuart to visit the appellant.

To the extent that the testimony bore also upon the question whether the appellant should continue to live with her mother, or whether for lack of "adequate parental care and support," her custody and guardianship should be transferred elsewhere, it was in substance and effect as follows: The appellant was born in 1924. In 1925, when she was nine months old, Dr. Stuart left the family home, although for several years thereafter he visited it on occasion. In 1929 he obtained a divorce from Mrs. Stuart in Virginia, which was followed by an agreement for support money to be paid by Dr. Stuart monthly in the sum of $350.00. From 1925 to 1930 the appellant and her mother lived in Georgetown in the home which Dr. Stuart had provided there. In 1930 Mrs. Stuart purchased a house in Chevy Chase, Maryland, where she and the appellant lived until 1938. In 1936 a new agreement in respect of support money was entered into, reducing the monthly sum to $150.00. This amount Dr. Stuart paid but intermittently; he made no payments after 1937. Because of this Mrs. Stuart lost the house in Chevy Chase in 1938 through foreclosure proceedings. Since that time she and the appellant have lived with friends, or in rooming houses. They first were with friends at Gaithersburg, Maryland, for a short period; in the summer of 1938 they shared a cottage in New Jersey with friends, returning to Gaithersburg in the fall and remaining there until the early winter; then they went to Claibourne on the Eastern Shore of Maryland to visit friends; finally they returned to Washington, where they occupied a room in January and February, 1939; and from then until May 12, 1939—the date of the hearing—they lived at three or four different boarding houses in Washington. Since 1937, when Dr. Stuart's payments ceased, Mrs. Stuart and the appellant have been in seriously straitened circumstances, at times not able to pay rent, and under the necessity of living "a furtive type of existence ... and attempting to dodge bill collectors."

During the years 1931 and 1932 the appellant was a student at the Chevy Chase Country Day School near the District of Columbia, and during the years 1932 to 1938 she was a student at the National Cathedral School for Girls in the District. During

1937 and 1938 she also attended dancing classes conducted by the Mrs. Shippen to whose custody and guardianship she was committed by the judgment appealed from. From June 1938 to May 1939 she was out of school. This was during the period when the appellant and her mother were living at the various places in and out of Washington above mentioned. A boarding scholarship, supplying clothes, was offered Mrs. Stuart for the appellant by the National Cathedral School for the school year 1938–1939, but was not accepted, for various reasons given—such as that the appellant felt under a duty to remain with her mother in time of need, and that the appellant was not happy there.

By the testimony of various witnesses of unquestioned dependability, called both in behalf of the District and of the appellant,[2] it was established that: Fairfax Stuart was a normal child, well cared for physically, and mentally advanced beyond her years. She was an outstanding member of the National Cathedral School for Girls —having a splendid record both as pupil and girl. Mrs. Stuart had devoted her entire time to making a home for her child and had provided an excellent one in every way until 1937, when she appeared to be in financial difficulties. After that she apparently provided the best home she could in view of her circumstances. There was a great deal of affection evident between the mother and daughter, who had progressed well in her mother's care. The child was alert, and happy. There was testimony by Mrs. Shippen that during the second of the two years when the appellant was enrolled in Mrs. Shippen's dancing class she seemed not to be very happy, apparently as the result of remarks made by some of the pupils reflecting upon the appellant's home and upon dissension existing between her father and mother.

Miss McDonnell testified at length. Her testimony, however, consisted largely of reading into the record, with the consent of counsel for the appellant, and upon the theory that it would refresh her recollection, a memorandum of the conversations she had had with the appellant and Mrs. Stuart. The memorandum seemingly consisted of running notes made at or about the time of the conversations. These conversations, it is to be noted, had not been had primarily in connection with the instant case, but in an attempt to work out arrangements, pursuant to the conditional order in the non-support case, for Dr. Stuart from time to time to interview his daughter. The memorandum does not lend itself to a topical summary. We set forth only the substance of that portion of it relied upon by the District, and we do so in terms of the District's brief:

"...in an effort to work out these interviews [the interviews between Dr. Stuart and the appellant upon which the nonsupport order had been conditioned], ... [Miss McDonnell] had had several conversations with Mrs. Stuart and the appellant in the presence of Mrs. Stuart. The witness saw Mrs. Stuart toward the end of March to discuss arrangements for carrying out the order. The mother refused to consider any arrangements whereby the child might be put in contact with the father or to make arrangements for the probation officer to interview appellant. Nothing further was heard from the mother until April 27th, when she came to the office saying she was in desperate need of money, and that, during the last two years, she had been living on money given to her by different individuals, but that it was not possible to continue living in this way. She stated that the appellant had been out of school since June, 1938, (the date of the trial being May 12, 1939); that the mother and child had lived a furtive type of existence, moving from place to place, and not always being able to pay the rent, and attempting to dodge bill collectors. During this interview Mrs. Stuart refused definitely to consider any arrangements through which Doctor Stuart could see the child. Mrs. Stuart stated that she had struggled to protect the child from the father during the child's entire lifetime and that, as much as she loved the child, she would rather see her dead than in contact with her father. The reasons which the mother gave as the basis for her feeling that contact with the

---

[2] The witnesses referred to were: Albert Hawley Lucas, headmaster of St. Albans School for Boys; Mabel B. Turner, principal of the National Cathedral School for Girls; Miss Katherine Colt; Miss Alice Colt; Miss Susan Craighill, retired administrative principal of Blair-Hayes School; Miss Alice Ball, an employee of the State Department; Mrs. Bruce Warden; Mr. William A. Neacey, an employee in the Legal Department of the Social Security Board; and Dr. Stanwood Cobb, principal of the Chevy Chase Country Day School.

father is inimical to the child's welfare were that the father had frightened the child into hysterics on certain occasions when she was an infant because of manifestations of interest of a sexual nature. The purported actions on the father's part occurred when the child was less than a year old. The mother, according to her statement, was not actually present, but said she knew from the child's screams what had happened and that the child corroborated this some months later when she learned to talk. The mother also stated that the father had attempted to perform certain experiments of a hypnotic influence over the child by the means of thought transference, and that, if he and the child were brought into close physical proximity, this hypnotic influence which he exercises would become more potent and endanger the child. The witness further testified that the mother finally agreed to permit an officer of the court to see the child in her presence, and an interview with appellant was had. Appellant stated in this interview that she hated her father, never wished to see him again, but admitted that she had no personal recollection of her father or of his actions towards her. She stated that her father was a wealthy man and could easily have supported her and her mother in a way they were entitled to be supported, that she felt she could not go on as they had been living, she could not go to school, she had no decent clothes and no home, and that she and her mother had to be constantly on the move to dodge bill collectors. She further stated that every time the door bell rang or the postman came she shuddered and felt like getting into a closet because it would be another bill which they could not pay. Appellant then asked what she would receive financially if she did consent to see her father, and, when it was explained to her that the order was for $150 per month, she said that this was not sufficient; that it was not worth going through the unpleasant experience of seeing her father for this amount, and that she and her mother could not live on $150 a month. Appellant said she would consent to see her father if he would agree to give her mother a lump sum sufficient to cover their outstanding obligations, which amounted to somewhere between seven and ten thousand dollars, which was just living expenses for a couple of years. Appellant further stated that her father had power to influence and to hypnotize people and that

he had used this influence on her as she was growing up; that she knew these things were true, but that she could not explain how she knew."

There was also testimony (by Miss Craighill) that "Mrs. Stuart has been very disturbed about her marital affairs for a long time and my role is that of listener"; and (by Miss Ball) that "I think she feared some harm to the child. She was never very definite. I think my instinct made me feel rather that she was a person under the torment of a distraught mind, that she burst out to some one she could trust."

Mrs. Stuart, called in behalf of the appellant, also testified. Her testimony has in substantial part been outlined above in the statement concerning the divorce, the agreement for support money and the reduction thereof, and the places of residence of the mother and child. Mrs. Stuart stated also that "the report of the conversations that she had had with Miss McDonnell had been considerably exaggerated and the statements that were made by her sounded more extreme than originally stated, and that those made by the child were also exaggerated." And Mrs. Stuart made certain further statements, which are relied upon by the District in support of the order. Quoting again from the brief of the District, these statements are as follows:

"Mrs. Stuart, the mother of appellant, took the stand and detailed the conditions under which she and appellant had lived. The court then asked Mrs. Stuart 'Is it true Mrs. McLean gave you a $1,000', to which Mrs. Stuart replied 'I hate to say anything about Mrs. McLean, but every one knows what is the matter with her.' The court then asked 'But did she aid you financially', to which Mrs. Stuart replied 'Mrs. McLean was good to me, but she has gone wool-gathering.' The attorney for Doctor Stuart thereupon asked Mrs. Stuart if she had not been represented by certain named attorneys, to which she replied 'That is another story, I have had rare experiences with those lawyers.' Thereupon the court asked Mrs. Stuart 'Is it true that you made the statement to an officer of this court that you would kill your child rather than permit her to see her father'. Instead of answering this question, Mrs. Stuart gave a recital of her marital difficulties. The court repeated the question the second and third time, warning Mrs. Stuart that if she failed to answer she would be in contempt of

court. Finally Mrs. Stuart responded 'I do not deny having made such a statement'."

The record shows that later Mrs. Stuart again interrupted the court and was found in contempt, the court saying that if it was again necessary to make such a finding the court would feel obliged to send her to a hospital to determine her mental condition, rather than to commit her to the District Jail for contempt. At that point in the proceedings the following, according to the record, occurred:

"The court [then] found 'That Fairfax Stuart is without adequate parental care and support, as alleged, and it is ORDERED, That Fairfax Stuart be, and she hereby is, placed under the guardianship of Mrs. Lloyd P. Shippen; father of said child to bear full expense for her support pending a further hearing on June 13, 1939.' Whereupon Mrs. Stuart jumped up and shouted, 'You can't do that.' Whereupon the court then held Mrs. Stuart in contempt the third time and ordered the bailiff to take Mrs. Stuart from the room and issued to the Superintendent of Gallinger Hospital the following order 'Receive into your custody the body of Margaret Berry Stuart, herewith sent by said Court for mental observation and report. The Court to be notified when Margaret Berry Stuart is ready to return to Court.'"

The record further shows that on June 13, 1939, counsel for the District moved that "inasmuch as Mrs. Margaret Berry Stuart had remained four or five days in the Psychopathic Ward of Gallinger Hospital before being released that she be considered to have purged herself from the contempt which she was found guilty of in the former hearing on May 12, 1939 and the Court passed an order providing that Mrs. Margaret Berry Stuart had purged herself of the contempt." Mrs. Stuart had been obliged to have recourse to habeas corpus proceedings in the United States District Court to secure release from her confinement in Gallinger Hospital. On May 17, 1939, the District Court ordered her discharged.

Upon the hearing on June 13, the Juvenile Court ordered that the guardianship of Fairfax Stuart be continued with Mrs. Lloyd P. Shippen and that the case be continued subject to the call of the Probation Department, Dr. Stuart to bear the expense of the appellant's support in the meantime.

## I

That part of the finding of the court that the appellant was without adequate parental "support," in the sense of lack of funds, is supported by the evidence in this case. But the necessity for funds to support the child and the duty of the father to provide them had been made the subject of hearing and determination in the previous case, wherein the court ordered the father to pay monthly $150 for the support of the child, and there was no need in the instant case of reiterating proof and judgment on that subject.

## II

The finding of the court that the appellant is without "adequate parental care" and the order transferring her custody and guardianship from her mother to Mrs. Shippen are, under the Juvenile Court Act (Act of June 1, 1938, 52 Stat. 596, c. 309, D.C.Code Supp. V, T. 18, § 251a et seq.) and the evidence in this case, without warrant.

By "adequate parental care" as used in the act is obviously meant such care as is necessary to accomplish the purpose of the Act. The purpose is stated in general terms as follows:

"The purpose of this Act is to secure for each child under its [the Juvenile Court's] jurisdiction such care and guidance, preferably in his own home, as will serve the child's welfare and the best interests of the State; to conserve and strengthen the child's family ties whenever possible, removing him from the custody of his parents only when his welfare or the safety and protection of the public cannot be adequately safeguarded without such removal; and, when such child is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents." [52 Stat. 596, c. 309, § 1]

The evidence overwhelmingly establishes that Mrs. Stuart's care of the appellant since her birth had been continuous and devoted and had resulted in a well developed, well educated, healthy child. It further establishes that when, as the result of the discontinuation of payments of support money by Dr. Stuart, she found herself without funds, Mrs. Stuart secured support for the child for the time being through the generosity of friends; and that ultimately she

made successful application to the public authorities to compel the father to support the child. It is true that the evidence shows that during the school year 1938-9, the appellant was not kept in school. But the declination of the offered scholarship at the National Cathedral School for Girls is adequately explained by the desire of the child to be with her mother in time of need; and the failure to enter the child in public schools was, it is to be inferred, occasioned by the fact that necessity required the mother and child to move about from place to place and to live with friends during the year in question.

■ The evidence wholly fails to show that the care given the appellant by her mother was insufficient to protect the appellant and the District in respect of the purposes of the Act more specifically expressed. In Section 5 the Act is made to apply:

"... to any person under the age of eighteen years—

"(1) Who has violated any law; or who has violated any ordinance or regulation of the District of Columbia; or

"(2) Who is habitually beyond the control of his parent, custodian, or guardian; or

"(3) Who is habitually truant from school or home; or

"(4) Who habitually so deports himself as to injure or endanger himself or the morals or safety of himself or others; or

"(5) Who is abandoned by his parent, guardian, or custodian; or

"(6) Who is homeless or without adequate parental support or care, or whose parent, guardian, or custodian neglects or refuses to provide support and care necessary for his health or welfare; or

"(7) Whose parent, guardian, or custodian neglects or refuses to provide or avail himself of the special care made necessary by his mental condition; or

"(8) Who associates with vagrants, vicious, or immoral persons; or

"(9) Who engages in an occupation or is in a situation dangerous to life or limb or injurious to the health or morals of himself or others . . .."

Nothing in this record indicates that Mrs. Stuart's care of the child had been such as had brought or would likely bring the appellant within any of the classes of persons thus mentioned in the statute.

## III

■ Counsel for the District at the argument of the case suggested that since, according to the evidence, Mrs. Stuart was unwilling to permit Dr. Stuart to visit the appellant, and since the support order in the previous case was conditioned upon the making of arrangements for such visits, an impasse had arisen which warranted the judgment. But we think there was no such impasse shown by the evidence as was solvable only by taking the child from her mother. A wiser solution of the difficulty would have been to consolidate the two cases, which were by nature related, and then to take such evidence as would have made it possible for the court to determine whether or not it would be to the detriment of the child for the father to visit her. If the determination were in the father's favor, the court was not lacking in means to enforce an order giving the father a right of visitation. If the determination were to the contrary, then the conditional order could have been modified. The duty of a father to support a child is not contingent upon his right to visit the child if it is inimical to the interests of the child for him to do so.

## IV

■ While the court made no finding on the subject of the mental competency of Mrs. Stuart, the principal argument made for the District in support of the judgment taking the appellant from the custody and guardianship of her mother is that the evidence supports "the conclusion that Mrs. Stuart is mentally incompetent to provide adequate parental care for appellant ...." We find nothing in the record relevant to the mental condition of Mrs. Stuart except the following: Her extreme statements concerning Dr. Stuart and his alleged interest in and hypnotic influence over the child; the testimony that Mrs. Stuart was disturbed about her marital affairs, that she feared some harm to the child, and that she was under the torment of a distraught mind; Mrs. Stuart's admission that she had once stated that she would rather kill her child than permit her to see her father; and her repeated interruptions of the judge during the hearing. Despite the fact that she was subjected to examination in the psychopathic ward of Gallinger Hospital for five days, there is nothing in the record from any physician that she was the subject of delusions, that she was likely to be harmful to her child, or that she was in

any manner mentally incompetent or unfit to associate with or care for her child. The failure of the District to produce any such testimony at the subsequent hearing on June 13, 1939, after the examination of Mrs. Stuart in Gallinger Hospital, is significant.

■ We think the evidence insufficient to establish such mental incompetence as made Mrs. Stuart unfit to associate with or care for her child. True, Mrs. Stuart's ideas that her former husband had an improper interest in and a hypnotic influence over the child seem on their face fantastic. But there is no evidence that they were the fixed delusions characteristic of insanity; and there is no evidence that the statement that the mother would kill the child rather than permit her to see the father was more than an extravagant and hasty utterance such as many a mother makes in a moment of foolish anxiety over an imagined evil doom for her child. So far as the interruptions of the court by the mother are concerned, we think they were the natural acts of a mother distraught at the thought of losing her child, and that as such they tend to prove her normal rather than the contrary. We bear in mind that the trial judge saw the mother and father in person and had more basis, therefore, for judging them than we have. But if as the District suggests, the real issue in the case was one of the mental competence of Mrs. Stuart to associate with and care for the appellant, such an important issue—one affecting the welfare and happiness of both the child and the mother as well as the interest of society—could have been determined only upon a presentation of dependable evidence, not upon such conjectural material as makes up this record. In its present state the record would not sustain a finding that the mother was mentally incompetent. It shows no more than that through marital unhappiness and poverty she was in an anguished and perhaps at times frantic state of mind. But this does not warrant depriving a mother of her child.

■ Under our constitutional system, the citizen has more than a revocable privilege to possess and to rear his children. Under our theory of government there is recognized as inherent in parents a right to maintain the custody and to direct the upbringing and education of their own offspring. True, this right is not absolute. If parents treat their children with cruelty or neglect, or are unfit in character or mode of life suitably to control their associations and upbringing, the state for the welfare of the child and society may interfere. But rights guaranteed by the constitution are not to be qualified either by legislation or judicial action having no reasonable relation to some purpose within the competency of the state. In respect of the liberty of parents to direct the upbringing and education of their children see Pierce v. Society of Sisters, 1925, 268 U.S. 510, 533, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468. The Congress has recognized these limitations in the statement above set forth of the purpose and basic principle of the Juvenile Court Act, and also in the express proviso in the Act that "nothing herein shall be construed as authorizing the removal of the child from the custody of his parents unless his welfare and the safety and protection of the public cannot be adequately safeguarded without such removal." 52 Stat. 596, c. 309, § 14 (3). We think that the judgment of the court in the instant case was inconsistent with these constitutional principles and the statutory expression thereof. Especially in view of the broadly phrased social considerations underlying the Act and the informality of procedure followed under it, these principles should be constantly kept in mind in the determination of individual cases.

## V

It will be noted that in Section 1 of the Act set forth above, it is stated that the purpose is to secure for each child under its jurisdiction such care and guidance, preferably in his own home "as will serve the child's welfare *and* the best interests of the State"; and that it is later stated in the same section that the child shall be removed from the custody of his parents "only when his welfare *or* the safety and protection of the public cannot be adequately safeguarded without such removal"; and that the proviso (appearing in paragraph 3 of Section 14) forbids removal of a child from the custody of his parents "unless his welfare *and* the safety and protection of the public cannot be adequately safeguarded without such removal." (Italics supplied) Calling attention to this use of the disjunctive in one instance and the conjunctive in two, counsel for the District urge that the statute is thus rendered ambiguous and therefore subject to construction, and that it must be construed in the disjunctive throughout, so as to authorize the court to

remove a child from the custody of his parents "either when his welfare requires such removal, *or* when the safety and protection of the public demands it." In making this argument counsel concede that "there is no evidence in this record to justify a finding that the safety and protection of the public require the entry of the order appealed from in this case." But they nevertheless urge that "If a child 'is habitually beyond the control of his parents,' or 'habitually so deports himself as to endanger himself or the morals or safety of himself,' it is obvious that cases will arise where the child's own good demands that he be removed from the custody of his parents, though such action would not be necessary for the safety and protection of the public." Counsel say further, "Let us assume, for example, that a child of tender years is so neglected by its parents that, through lack of nourishment and medical attention, the child will die,—in such a case it is obvious that the child must be removed from the custody of such parents, and yet it would be impossible for the court to find, as counsel for appellant contend it must, that the removal was necessary for 'the safety and protection of the public.'" In the instant case the point is largely academic. There is nothing in the evidence which justifies the conclusion that either the welfare of the appellant or the safety and protection of the public required the severance of custody and guardianship which the court ordered. But since counsel for the District vigorously contend that it is important to the administration of the Juvenile Court Act that the disjunctive construction which they urge be adopted, we think it justifiable to rule upon the point for the guidance of the trial court.

■ Any ambiguity which may be said to exist in the statute because of the use of the disjunctive in the phrase referred to is resolved by the Senate and House reports upon the Act.[3] In both such reports the Committees on the District of Columbia in their analysis of the bill stated concerning the Act:

"It seeks to change the nature of the existing court. It would make a new type of court based on the broad principle that the child who comes before the court is not to be regarded as a criminal, but as one *whose individual welfare coincides with the*

*well-being of the State* and who is to be saved to it rather than prosecuted by it. . . ." [Italics supplied]

And we think that the distinctions attempted to be taken by counsel are unsound and that their fears for the administration of the Act, unless the disjunctive construction is made, are unfounded. If the welfare of a child is at stake, so is the welfare of the public. If, to take the example suggested by counsel, a child of tender years is so neglected by its parents that through lack of nourishment and medical attention it will die, to say that in such a situation the safety and protection of the public is not involved is, we think, wholly unwarranted.

## VI

By way of further clarification of the meaning of the Act we comment upon an argument of the appellant: It is said in the appellant's brief: "Jurisdiction of the Juvenile Court under the Act ... is dependent upon the evidence and in this case the evidence shows no such lack of parental care and support as would give the Juvenile Court jurisdiction to make appellant a ward of the Court." And throughout the oral argument of the appellant it was insisted that the Juvenile Court was without "jurisdiction" to make the order appealed from.

■ While it is sometimes loosely said that a court has no "jurisdiction" to make an order not supported by the evidence necessary to prove the cause of action set forth in the complaint which invokes the action of the court, it is important to point out, for the sake of clarity in respect of the power of the Juvenile Court, that in the proper sense of the word jurisdiction a court has jurisdiction, in the sense that its erroneous action is voidable only and not void, when the parties are properly before it, the proceeding is of a kind or class which the court is authorized to adjudicate, and the claim set forth in the complaint is not obviously frivolous. Binderup v. Pathe Exchange, 1923, 263 U.S. 291, 305, 306, 44 S.Ct. 96, 68 L.Ed. 308; and see Howat v. Kansas, 1922, 258 U.S. 181, 189, 42 S.Ct. 277, 66 L.Ed. 550; Cooper v. Reynolds, 1870, 10 Wall. 308, 316, 19 L.Ed. 931; Brougham v. Oceanic Steam Navigation Co., 2 Cir., 1913, 205 F. 857, 859; Hughes v. Cuming, 1900, 165 N.Y. 91, 95,

---

[3] Sen.Rep. No. 530, 75th Cong., 1st Sess. (1937) 4; H.R.Rep. No. 177, 75th Cong., 1st Sess. (1937) 3.

834

58 N.E. 794. In this proper sense of the word jurisdiction the Juvenile Court in the instant case had jurisdiction to make the order appealed from. The parties were before it, the case described in the petition was within the class of cases which the Act gives the court power to deal with—to wit, a case involving a question of adequate parental care of a person under the age of eighteen—and the petition on its face stated a cause of action. That the evidence failed to support the petition did not affect the jurisdiction of the court, in the proper sense of the term, to hear the cause and to make the order. But it did, as we have pointed out above, make the action of the court erroneous and subject to reversal on appeal.

We have set out in this opinion a description of the proceedings as a result of which Mrs. Stuart was confined in the Gallinger Hospital for psychiatric examination, after a judgment for contempt. We have done so only because of the relevancy of these proceedings and the result of them to the mental condition of Mrs. Stuart. No point is raised on the appeal as to the legality of Mrs. Stuart's confinement, and we therefore do not rule upon it.

Reversed.