584 A.2d 1230 (1990)
In re O.L.
Appeal of B.L.
No. 89-229.
District of Columbia Court of Appeals.
Argued May 16, 1990.
Decided July 10, 1990.
Nicholas J. Hluchyj, Washington, D.C., appointed by this court, for appellant B.L.
Ann Sungmie Suh, Washington, D.C., appointed by this court, for appellee O.L.
Donna M. Murasky, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee District of Columbia.
Before TERRY, SCHWELB and FARRELL, Associate Judges.
SCHWELB, Associate Judge:
The principal issue presented in this appeal is whether, in a child neglect proceeding based on the mother's alleged mental illness and drug abuse, the trial judge may, over the mother's objection, "waive" her physician-patient privilege with respect to past professional evaluations of her mental condition. Substantially for the reasons stated by Judge A. Franklin Burgess, Jr. in his excellent opinion in In re D.H., 117 Daily Wash.L.Rptr. 2109 (Super.Ct.D.C. 1989),[1] we answer that question in the affirmative.[2]

*1231 I
O.L., (the child), was born to B.L., (the mother), on October 21, 1986. On December 21, 1987, the Corporation Counsel filed a petition alleging that O.L. was a neglected child within the meaning of D.C.Code § 16-2301(9)(B) and (C) (1989). The petition alleged in pertinent part that
[s]aid child's mother is unable to provide appropriate care and supervision for said child due to her mental illness and drug usage. On or about April 22, 1987, said child's mother admitted using illegal drugs in said child's presence. Said child's mother was treated for mental illness in 1982. Ms. [L.] was then diagnosed as suffering from "brief reactive psychosis." On several occasions in March, April, and November 1987, Ms. [L.] was observed to exhibit inappropriate, violent behavior and rapid mood swings, including private and public property destruction, displaying signs of mental illness.
After the petition was filed, the government sought a pretrial order waiving the mother's physician-patient privilege with respect to her prior treatment at St. Elizabeths Hospital. The government relied on D.C.Code § 2-1355 (1988), which authorizes the admission "in any proceeding ... concerning the welfare of a neglected child" of evidence that would otherwise be barred by the physician-patient privilege, provided that the court has determined that such privilege should be waived in the interest of justice.[3] The mother opposed the request, however, and Judge Geoffrey M. Alprin sustained her position. Noting that § 2-1355 was a part of the District's statutory scheme requiring mandatory reporting of suspected cases of child neglect and abuse by certain health care professionals, see D.C.Code §§ 2-13512-1357 (1988), he concluded that, notwithstanding its apparent plain meaning, § 2-1355 was limited in its application to cases in which such professionals were making the required reports. In re O.L., 116 Daily Wash.L.Rptr. 2733 (Super.Ct.D.C.1988) (O.L. I).[4] Judge Alprin held that D.C.Code § 16-2315(e)(1) (1988), which authorizes the court to order a mental or physical examination of a parent before trial where that parent's mental or physical capacity to care for the child is in issue, is the appropriate vehicle for securing an expert assessment of the parent's psychological condition.
The case subsequently came before Judge Curtis von Kann, who ruled at trial, and subsequently reiterated in a written opinion, In re O.L., 117 Daily Wash.L.Rptr. 1329 (Super Ct.D.C.1989) (O.L. II), that the psychiatrist and psychologist who examined the mother pursuant to § 16-2315(e)(1) were authorized, despite the mother's refusal to waive the physician-patient privilege, to review the records of her past mental health treatment. Relying inter alia on these experts' testimony, which was based in part on the records of the mother's past treatment, the judge found respondent O.L. to be a neglected child.
The mother now appeals from the adjudication of neglect. Her primary contention in this court[5] is that the trial judge committed reversible error by overruling her claim of physician-patient privilege.

II
Although Judge von Kann, treating Judge Alprin's construction of § 2-1355 as law of the case, and viewing it as correct in any event, authorized examination of the mother's records for other reasons, O.L. II, *1232 supra, 117 Daily Wash.L.Rptr. at 1333-38, we agree with and adopt Judge Burgess' views in D.H. as to the reach of that statute. Accordingly, we affirm the evidentiary ruling and the subsequent adjudication of neglect on grounds different from those on which the trial court relied.[6]
Counsel for the mother contends that Judge Burgess' construction of § 2-1355 is contrary to its "plain language." Observing that the statute applies by its terms to any proceeding "concerning the welfare of a neglected child," counsel argues that O.L. had not been found to be a neglected child at the time the privilege was waived. Accordingly, he claims, § 2-1355 must be inapplicable.
The problem with this purportedly literal construction is that it puts the cart before the horse; under the mother's scenario, the judge must make the most important decision implicating the child's safety and welfare before receiving what may be the most important information on the subject. As we observed in In re N.H., 569 A.2d 1179, 1183 (D.C.1990), in sustaining the trial judge's waiver of the privilege on the basis of § 2-1355 during the fact-finding hearing designed to determine whether N.H. had been neglected,
[t]he statutory definition of neglected child includes a child whose parents are unable to discharge their responsibilities because of mental incapacity. D.C.Code § 16-2301(9)(B). Obviously, to exclude information about the mother's mental condition would deprive the judge of important information required for a disposition in the best interests of the child.
It is in determining whether the child has been neglectedwhether the mother is unable to discharge her responsibilities because of mental incapacitythat the court needs the information about the parent's mental health.
Moreover, as we have previously noted, the Mental Health Act requires mental health professionals to report suspected cases of neglect or abuse to the appropriate District of Columbia agencies.[7] "It taxes logic to suggest that the Mental Health Act authorizes disclosure but would prohibit the same physician, despite § 2-1355, from bringing the same information to the attention of the court in a closed proceeding in the Family Division." N.H., supra, 569 A.2d at 1183 n. 7.
The statutory definition of "neglected child" does not specify that there must have been a prior adjudication of neglect. D.C.Code § 16-2301(9)(B) (1988). There is therefore some question whether the mother's proposed construction of the term is indeed a literal one. Assuming, for the sake of argument, that it is,[8] we are confident *1233 that the Council of the District of Columbia did not intend to deprive the court, in carrying out is responsibilities to the child as parens patriae, of access to facts which would assist it in making an informed judicious decision as to whether state intervention is appropriate in the lives of the child and his or her parents. Even if we continue to indulge the assumption that the term "neglected child" as used in § 2-1355 literally means what the mother's counsel says it means, we should not make a fortress out of the dictionary at the expense of achieving the evident legislative purpose of enabling the court to carry out its obligations to the child. See generally Alvarez v. United States, 576 A.2d 713, 716-17, (D.C.1990), and authorities there cited.
Our conclusion that Judge Burgess' analysis of § 2-1355 is correct is further bolstered by two recent decisions of this court, both of which were issued after D.H. In N.H., supra, we rejected the contention that only the Mental Health Information Act of 1978, D.C.Code § 6-2002 (1989), applies to the question whether past mental health records may be admitted into evidence in child neglect proceedings where the mother has invoked the physician-patient privilege. We expressly held, on the contrary, that § 2-1355 controls. 569 A.2d at 1183. In rejecting the mother's claim that disclosure would contravene what she described as her constitutionally protected right to privacy, we held, citing analogous authority from other jurisdictions, that "the interest of the District of Columbia in assuring that the mother is mentally competent to raise the daughter is sufficiently strong to limit the mother's privacy rights." Id. at 1184. We also stated that "policy considerations involving custody and welfare of children dictate the need for flexibility in applying technical rules of evidence." Id. (citation omitted.)
In In re S.K., 564 A.2d 1382 (D.C.1989), we held that "[c]ivil neglect statutes are designed to enable the state to identify and protect children who are in need of assistance; they are remedial and should be liberally construed." Id. at 1388. We added that one cannot determine whether a child's welfare requires the intervention of the state "by simply examining the most recent episode. Rather, the judge must be apprised of the entire mosaic." Id. at 1389.[9]
Our approach in N.H. and S.K. is altogether incompatible with the notion that remedial child neglect legislation should be construed to deprive the judge of information which he or she needs in order to protect the safety and welfare of a minor child who has allegedly been neglected or abused. We do not minimize the importance of the physician-patient privilege, especially in the area of mental health. As the court stated in In re S.W., 79 Cal. App.3d 719, 722, 145 Cal.Rptr. 143, 145 (1978),
[w]hen a parent is afflicted with an illness or disability which may affect the welfare of the child, the confidentiality of communication with a therapist may encourage the parent to seek treatment, and may permit a kind of treatment otherwise impossible.
It is therefore of some importance that § 2-1355 authorizes waiver of the parent's physician-patient privilege only where the court determines that such waiver would be in the interest of justice. We emphasize that such a determination cannot be automatic.[10] On the contrary, it requires the judicious exercise of discretion, especially in the light of the considerations articulated by the California court in In re S.W.
As this court explained in N.H., supra, 569 A.2d at 1184, however, the District's statutory scheme is narrowly drawn to minimize any invasion of privacy. Child neglect hearings are closed, records are confidential, and there are penalties for unauthorized disclosure. Id. at 1184 n. 10, and see statutes and authorities there cited. *1234 Even such limited disclosure can be made only after a specific finding that the privilege should be waived in the interest of justice. Section 2-1355, reasonably construed, strikes what the Council could rationally believe to be a suitable balance between the various interests presented. No artificially constricted reading of a basically unambiguous provision is required or appropriate.

III
For the foregoing reasons, the judgment appealed from is hereby
Affirmed.

APPENDIX

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA FAMILY DIVISION
IN THE MATTERS of D.H., D.H. RESPONDENTS, Sup.Ct., Fam.Div., Neglect Branch, Nos. N098-89, & N098-89, August 1, 1989. Opinion per Burgess, J. Robert A. Garske for Mother. Teresa R. Donohoe for D.H. Laurie McManus for D.C.
BURGESS, J.: The issue in this case is whether D.C.Code § 2-1355 (1989 Repl.)[1] authorizes the Court to waive the physician-patient privilege[2] in this neglect proceeding. In In the Matter of O.L., 116 WLR 2733 (D.C.Super.Ct. Nov. 16, 1988), another judge of this Court ruled that section 2-1355 authorized waiver only when the information sought is held by, or contained in reports by, a health professional making a required report pursuant to D.C. Code § 2-1352 (1988 Repl.). Since the information the government seeks here is not held by someone who was required to make a report of neglect or abuse, application of the holding in In the Matter of O.L. would require denial of the government's motion. In an oral ruling, however, this Court, disagreeing with the holding of In the Matter of O.L., held that section 2-1355 provided it with authority to waive the privilege in the present case and went on to order disclosure of some of the patient's records and of the testimony of a St. Elizabeths psychiatrist familiar with her. Because the issue is a recurring one in neglect cases, the Court will here set forth the reasons for its ruling in writing.

I.
The facts available at the time of the motion may be summarized briefly. The government alleged that the child was neglected by reason of the mental illness and hospitalization of the mother.[3] The government proffered, based on information from family members, that the mother had been hospitalized at St. Elizabeths for some time. The government sought information regarding the length of the hospitalization, and the nature, severity and chronicity of the illness. The mother did not argue that the information sought was irrelevant to the issues to be determined. Rather, she contended that the physician-patent *1235 privilege protected the information and that the Court had no authority to waive it.

II.
There is no doubt that section 14-307(a) would protect the information at issue unless the privilege granted there has been waived or unless the Court could waive it. No one argued that the information was otherwise available through the record of an involuntary commitment proceeding in the District of Columbia or through a prior waiver. Thus, the issue of the authority granted by section 2-1355 was squarely presented.
Section 2-1355 states that "neither the husband-wife privilege nor the physician-patient privilege shall be grounds for excluding evidence in any [neglect] proceeding" if the Court determines that the privilege "should be waived in the interest of justice." The kinds of evidence subject to the waiver are not limited by the terms of the statute. The waiver applies to "evidence", and this term is broad enough to encompass information possessed by a doctor or other health professional whether that information was previously required to be disclosed or not. Thus, the plain meaning of the statute, with words given their ordinary meaning, see Davis v. United States, 397 A.2d 951, 956 (D.C.1979), authorizes the waiver requested by the government. Counsel for the mother agreed with this reading of the statute, and the Court in In the Matter of O.L., focusing on the words "any proceeding", also appeared to believe that the plain meaning of the statute supported the government's position. In the Matter of O.L., supra, 116 WLR 2737. Since the words used by the legislature ordinarily are the best evidence of its intent, the Court should not depart from the plain meaning of those words unless it finds "`persuasive reasons for doing so.'" Peoples Drug Stores, Inc. v. District of Columbia, 470 A.2d 751, 755 (D.C.1983) (en banc), quoting Tuten v. United States, 440 A.2d 1008, 1013 (D.C.1982), aff'd, 460 U.S. 660 [103 S.Ct. 1412, 75 L.Ed.2d 359] (1983).
Relying on the opinion in In the Matter of O.L., supra, the mother argues that the context of section 2-1355 and its legislative history require a narrowing interpretation of that section. Context and legislative history can be used to give meaning to words superficially clear, to disclose a purpose inconsistent with the plain meaning of a statute, or to demonstrate that following the plain meaning would lead to an absurd or unjust result. Peoples Drug Stores, supra, 470 A.2d at 754-55. The Court in O.L. concluded that the context and history of the statute disclosed an intent to limit the application of the statute to information possessed by a health professional who is required by law to make a report of neglect or abuse. In the Matter of O.L., supra, 116 WLR 2738. Although the issue is obviously one on which reasonable people can differ, this Court finds itself unpersuaded that the legislature intended this result.
Actually, there are two legislatures whose intent is at issue. Section 2-1355 was first enacted in 1966 as part of Public Law 89-775 entitled "An act to provide for the mandatory reporting by physicians and institutions in the District of Columbia of certain physical abuse of children" ("1966 Act"). 80 Stat. 1354, 1355 (1966). It was codified at D.C.Code § 2-165 (1967). The section was reenacted by the City Council as part of Title I of the Prevention of Child Abuse and Neglect Act of 1977 ("1977 Act"). D.C.Law 2-22, Title I, § 103(f), 24 D.C. Reg. 3341 (1977). Later, the section was recodified at D.C.Code § 2-1355 (1981).
When the waiver provision was first enacted, it was, as the Court in In the Matter of O.L. observed, part of legislation aimed at identifying child neglect cases by requiring doctors to report abuse of children and by protecting them from liability when they did so. The stated purpose of section one of the 1966 Act was "to provide for the protection of children who have had physical injury inflicted upon them or who have suffered physical harm due to neglect." It stated that physicians who observed such abuse should report it so that governmental agencies could "intervene to protect the children and preserve family life." Section two required physicians to report or cause *1236 reports to be made of abuse "notwithstanding section 14-307 of the District of Columbia Code." Section three prescribed the content of the report and the procedures for making it. Section four granted immunity to doctors and hospitals making a good faith report of abuse and provided that any person making the report "shall have the same immunity with respect to participation in any judicial proceeding involving such report." Section five is the section at issue here. Section six provided that children being treated by spiritual means in accord with the tenets of recognized religious denominations were not considered to be "neglected."
In In the Matter of O.L., supra, the Court concluded, "It is clear from its title and content that the 1966 law was intended to be a reporting statute and nothing more." 116 WLR 2738. Although the evidence for this conclusion is ambiguous, this Court is inclined to agree that Congress in 1966 intended the waiver provision to apply only to neglect cases in which a report was required to be made. It is necessary, however, to give a somewhat detailed history of the legislation to understand both the ambiguity of the evidence and the conclusion this Court has reached regarding Congress' intent.
A child abuse reporting bill was first introduced in Congress by Rep. Multer of New York in January 1964, as H.R. 9652. 88th Cong., 2nd Sess. (1964). That bill, apparently substantially similar to a model bill developed by the Children's Bureau of the Department of Health Education and Welfare,[4] contained reporting measures similar to those in the statute under consideration, except that what the doctor was required to report was limited to "serious physical injury or injuries". Id. § 2. Other differences appear in section five of the bill. It provided as follows (the parts of the section materially different from section 2-1355 are [italicized]):
Neither the physician-patient privilege nor the husband-wife privilege shall be a ground for excluding evidence regarding a child's injuries or the cause thereof, in any judicial proceeding resulting from a report pursuant to this Act.

Id. § 5. That bill, of course, was not enacted into law.
Around January 19, 1965, the Commissioners of the District of Columbia submitted to the Speaker of the House of Representatives their own draft bill covering the same subject. Unfortunately, the Court has been unable to locate that bill, but a letter accompanying it appears in the legislative history of the 1966 Act. In that letter, Walter Tobriner, President of the Board of Commissioners, summarized the provisions of the bill. H.R.Rep. No. 744, Letter by W. Tobriner, supra note 4. He stated that the mandatory reporting provision covered children who had been "seriously injured other than by accidental means" and who had been "seriously harmed due to neglect." Id. at 4. He summarized section five, as follows:
Section 5 declares that, notwithstanding existing provisions of law establishing the husband-wife privilege (D.C. code, sec. 14-306) and the physician-patient privilege (D.C.Code, sec. 14-307), neither of such privileges shall be a ground of excluding evidence in any judicial proceeding resulting from a report made pursuant to the bill.
Id. at 5. Although the issue is not absolutely free from doubt, the Court infers that the waiver provision in the Commissioner's bill, like the same provision in Rep. Multer's prior bill, was limited to a proceeding *1237 "resulting from a report made pursuant to [the] Act." The evidence for this inference is that the comment in Mr. Tobriner's letter virtually tracks the language of the prior bill, in the manner of section-by-section analyses often found in legislative committee comments on statutes. The Commissioners' bill was different from the first bill, however, in that it required reports not only about physical injuries, but also about "physical harm due to neglect." Id. Correspondingly, it appears that the limitation on "evidence", namely, that it be "regarding a child's injuries or the cause thereof", was dropped because the reporting requirement was extended to "physical harm due to neglect" as well as to "injuries".
When the bill was introduced, again by Rep. Multer, in August 1965, as H.R. 10304, the extension of the reporting requirement to "serious physical harm due to neglect" was retained, but significant changes occurred in the waiver section. This time, section five read as follows (the materially new parts are [italicized]):
Notwithstanding the provisions of the District of Columbia Code, sections 14-306, 14-307 and 14-308, neither the physician-patient privilege nor the husband-wife privilege shall be a ground for excluding evidence in any proceeding in the Juvenile Court of the District of Columbia concerning the welfare of such child, provided that the Juvenile Court determines such privilege should be waived in the interest of public justice.

89th Cong., 1st Sess., at 3 (1965). Thus, the bill actually introduced dropped from Rep. Multer's prior bill and the Commissioners' draft the limitation of the waiver to only those judicial proceedings "resulting from a report pursuant to this Act", and substituted for it: "provided that the Juvenile Court determines such privilege should be waived in the interest of public justice." As the Commissioners' draft did, the revised bill also eliminated the limitation on what was to constitute potentially nonprivileged "evidence" under this section, no longer limiting it to evidence "regarding a child's injuries and the cause thereof". Instead, evidence could be admitted over the assertion of the privilege in any proceeding "concerning the welfare of such child." Section five of the House bill was enacted into law exactly as written, except for technical corrections.
It is clear that, in dropping the phrase "resulting from a report pursuant to this Act", the drafters of the legislation intended the waiver authorization to extend to cases beyond those that actually arose from a report made by a doctor. How far beyond that category of cases is not obvious. A reasonable inference is that the legislators wanted no limitation on the neglect cases to which the waiver authorization applied, except that the judge determine that the waiver be "in the interests of public justice." In calling up the bill for a vote, Rep. Multer explained:
Whereas present District of Columbia lawDistrict of Columbia Code, section 14-308provides for the waiver of the physician-patient privilege in the instance of judicial proceedings in criminal cases, no such waiver is presently provided in regard to proceedings in the juvenile court. Since such proceedings are often necessary as a step in protecting a child who is apparently the subject of abuse, the vital importance of section 5 of this bill, which provides for the waiver of both physician-patient and husband-wife privilege in a juvenile court proceeding when the judge of such court determines this to be in the interest of public justice, is amply clear.
111 Cong.Rec. 19,685 (1965). The same remark appears in the report of the District of Columbia Committee recommending passage of the bill without amendment. H.R. Rep. 744, 89th Cong., 1st Sess., at 3 (1965). Evidently, the drafters took as their model, not the waiver provision in the model bill first introduced in 1964, but D.C.Code § 14-307(b)(1) (1964 Supp. III),[5] which *1238 makes the physician-patient privilege inapplicable to
evidence in criminal cases where the accused is charged with causing the death of, or inflicting injuries upon, a human being, and the disclosure is required in the interests of public justice.
It is apparent that the legislators concerned with this bill believed that the public interest in an accurate determination of child neglect proceedings was on a par with its interest in the outcome of criminal cases where injury was inflicted. If this is so, it would appear inconsistent to want the waiver authorization applied to some neglect cases, those in which a doctor was required to report evidence of abuse, and not to others.
Nevertheless, the drafters chose to define the cases in which the waiver could be invoked as "any proceeding ... concerning the welfare of such child". P.L. 89-775, Sec. 5, 80 Stat. 1354, 1355 (1966). (Emphasis added.) Although there is no referent for "such child" in section five, there is in other sections. Section two of the 1966 Act, which imposed the reporting requirement applied to a physician who observed injury or physical harm to "a child under the age of eighteen brought to [the physician] or coming before [the physician] for examination". P.L. 89-775, Sec. 2, 80 Stat. 1354 (1966). And section three required the physician to report, among other things, "the child's age, nature and extent of the child's injuries...." P.L. 89-775, Sec. 3, 80 Stat. 1354 (1966). Unless the use of "such child" in section five were considered inadvertentan assumption a court should hesitate to make, the phrase must be interpreted to refer to the child described in sections two and three, that is, a child about whom the report was required to be made. Accordingly, it appears that Congress in 1966 did intend the waiver authorization to apply only in cases in which doctors had been required to make a report.
The elimination of the phrase "resulting from a report" is not inconsistent with this interpretation. Congress may have thought that phrase unduly restrictive because, read literally, it did not include proceedings which did not in fact result from a report, as where the doctor did not make one, but in which the doctor ought to have made a report. Moreover, given that the kind of neglect that concerned Congress was non-accidental physical injury and "physical harm due to neglect," P.L. 89-775, Sec. 2, supra, it was not illogical to confine the waiver authorization to cases in which the doctor was required to make a report. Doctors were likely to see such cases, and the information from a doctor needed for an accurate determination of the facts as to whether abuse occurred was likely to be held by doctors required to make a report, not by doctors who had not seen the child.[6]
In the 1977 Act, the City Council made many significant changes in the neglect laws. As the Court in In the Matter of O.L. observed, supra, 116 WLR 2738 and n. 8, it expanded the class of people required to report evidence of abuse of neglect to include
every physician, psychologist, medical examiner, dentist, chiropractor, registered nurse, licensed practical nurse, person involved in the care and treatment of patients, law enforcement officer, school official, teacher, social service worker, *1239 day care worker, and mental health professional.
D.C.Law 2-22, Title I, Section 103(c), 24 D.C. Reg. 3341, codified at D.C.Code § 2-1352(b) (1988 Repl.). These people were required to make a report whenever they knew or had reason to suspect
that a child known to [them] in [their] professional capacity has been or is in immediate danger of being a mentally or physically abused child or neglected child, as defined in § 16-2301(9)....
D.C. Law 2-22, title I, section 103(c), 24 D.C. Reg. 3341, codified at D.C.Code § 2-1352(a) (1988 Repl.). By these amendments the City Council greatly enlarged the kinds of neglect cases required to be reported.
The Council also changed the waiver provision. In place of "in any proceeding ... concerning the welfare of such child", it substituted: "In any proceeding ... concerning the welfare of a neglected child."[7] The Court in In the Matter of O.L. concluded that the Council reenacted the waiver provision "in virtually identical fashion to the earlier version", supra, 116 WLR at 2738, but this Court believes that the change from "of such child" to "of a neglected child" is significant and determinative of the Council's intent. The waiver provision not only omits "resulting from a report", but now also is no longer tied, by the use of "such child", to only those children who have been the subject of a required report. The provision applies to any proceeding concerning the welfare of a neglected child, that is to say, to every neglect proceeding.
The Court in In the Matter of O.L. also found support for its narrowing construction in the City Council's decision in the 1977 Act to amend the law to permit a court to order a mental or physical examination of a parent prior to trial. Subsection (e) of section 16-2315 of the Code was amended to permit such examinations to obtain evidence for use at an adjudicatory hearing on allegations of neglect by reason of physical or mental incapacity or hospitalization.[8] The O.L. Court concluded that the Council "determined that section 16-2315(e), not section 2-1355, would be the applicable mechanism to be utilized when a parent's mental capacity had been placed in issue by a specific allegation in the petition." Supra, 116 WLR 2738. If section 16-2315(e) were inconsistent with the broad grant of authority contained in the plain meaning of the words, a limitation on section 2-1355 might arguably be implied. But the two provisions are not inconsistent.
In enacting section 16-2315(e), the Council might have thought it necessary to supplement the access to information provided by section 2-1355 in order to give the Court a way to generate information about a parent or guardian who has no history of physical or mental health diagnosis and treatment and therefore has no records which could be obtained under section 2-1355. Even if a parent has such a history, *1240 there may be a need to obtain information about his or her current mental or physical condition because the records of the prior examination are unavailable, the psychiatrist or psychologist is unavailable to testify, or the prior examination occurred too far in the past to be of much use. These examples illustrate why the City Council may have wished to augment, rather than diminish, the power of the Court to obtain information about the mental condition of a parent or guardian.
It is also helpful to consider the implications of a statutory scheme in which the only way to obtain information about the parent or guardian, not held by a health professional required to make a report, is by ordering an examination. Supposing as in the present case that the patient is hospitalized and is under constant evaluation and examination, it makes little sense to order a new mental or physical examination, or both, if a patient is under day-by-day scrutiny and evaluation or has been fully examined recently. A new examination would be costly and might impose additional and unnecessary intrusions on the patient. Another case might also be supposed in which an examination is ordered but the patient refuses to submit to the examination. In such a case, an evidentiary inference could be drawn or a contempt order entered to coerce submission. But these methods of ascertaining the facts are inferior to use of medical records and expert testimony. The records and the testimony can be produced promptly and can be used to provide a full explanation, tested by cross-examination, of the parent's mental or physical condition.
Because the amendment to section 16-2315(e) is not inconsistent with the broad grant of authority granted by the language of section 2-1355, the Court is unpersuaded that the City Council impliedly intended that, apart from information of neglect or abuse required by law to be reported, relevant information about the physical and mental health of a parent could only be obtained by ordering a mental or physical examination. Actually, if any other action by the Council in 1977 bears on the construction of section 2-1355, it would be the Council's decision to enact a new waiver provision for cases involving termination of parental rights, presently codified at D.C. Code § 16-2359(e) (1981). That subsection provides:
Notwithstanding the provisions of D.C. Code, sections 14-306 and 14-307, neither the husband/wife privilege nor the physician/client or mental health professional/client privilege shall be a ground for excluding evidence in any proceeding brought under this subchapter.
See D.C.Law 2-22, Title IV, § 410, 24 D.C. Reg. 3341 (1977). No requirement is imposed that would limit the information subject to waiver to that held by a health professional required to make a report of abuse or neglect, yet it is obvious that the Council modelled this provision on section 2-1355, except for dropping the "in-the-interest-of-justice" proviso, and in fact stated that this section was "similar" to section 2-1355. Committee on the Judiciary, Report on Bill 2-48, Law 2-22: The Prevention of Child Abuse and Neglect Act of 1977 (March 29, 1977). The Council went on to state:
In determining whether to terminate parental rights, the primary concern of the court is the welfare of the child before it. The importance of this decision, together with the nature of these proceedings[,] outweigh[s] the competing demands of these privileges.
Id. Unless it is believed that the Council wanted the waiver in section 16-2359(e) to be limited to health professionals required to make a report, for which proposition there is no support in the language or legislative history, it appears that the Council, in enacting language virtually identical to section 2-1355 except for the absence of the proviso, itself believed that section 2-1355 was not limited to information held by those required to make a report.
Finally, the Court turns to the statutory context in which section 2-1355 was enacted. It is obvious that the waiver provision *1241 was enacted, on both occasions, in conjunction with laws requiring reports of neglect. The Court in In the Matter of O.L., viewing section 2-1355 in relation to the other provisions of the statute, concluded that the waiver authorization was limited to evidence held by reporting professionals. Supra, 116 WLR 2738. This Court does not agree with this conclusion.
If the plain meaning of section 2-1355 were incompatible with the other sections either by thwarting their objective or yielding an absurd or unjust result, when read in their light, a narrowing construction would be required. But, in the Court's view, there is nothing inconsistent, absurd or unjust in a reading of section 2-1355 that adheres to its broad language. A trial court may waive the physician-patient privilege in a case not involving a required report without hindering Congress' objective to have medical and other professionals report neglect in cases that come to their attention. Following the plain meaning of section 2-1355 gives it a broader scope than the rest of the legislation of which it is a part, but the Court does not believe that a broader purpose, not inconsistent with other purposes, and not itself illogical, absurd or unjust, gives a persuasive reason for departure from the plain meaning. Because the class of people required to make a report, and the kinds of neglect required to be reported, were greatly expanded in the 1977 Act, there will be many neglect proceedings resulting from a report of neglect by someone not subject to the doctor-patient privilege. There will also be cases in which no report was required to be made. In these cases, doctors or other health professionals who have not, for one reason or another, had reason to suspect neglect may have relevant and important information regarding a parent's mental or physical health. Obtaining that information from doctors not under an obligation to make a report in no way affects the reporting obligations of other doctors who do have reason to suspect neglect.

III.
Evidentiary privileges like the physician-patient privilege, granted by the legislature, can be withdrawn by the legislature. If the plain language of a statute withdrawing a privilege is not limited, as in section 2-1355, the Court should not impose a limitation unless something in the context of the statute, or the legislative history, provides a persuasive reason for doing so. This Court has found no such reason, and therefore interprets the words according to the meaning which their ordinary sense conveys.
This conclusion does not mean that waivers should be imposed routinely and in every case. The Court must find that waiver is in the interest of justice, and this standard requires a careful consideration of the need for the information. In the present case, after the Court had ruled that it had the authority to grant the waiver, the parties agreed on what should be disclosed. Thus, the Court was not required to undertake the exercise of discretion required by section 2-1355.
NOTES
[1] The opinion in In re D.H. is reproduced in its entirety as an appendix hereto. See pp. 1234-1241, infra.
[2] Although the precise issue of statutory interpretation presented in this case was apparently not raised in In re N.H., 569 A.2d 1179 (D.C. 1990), that decision is also consistent with, and in some measure foreshadows, the result we reach today.
[3] Section 2-1355 is quoted in its entirety in footnote 1 to Judge Burgess' opinion in In re D.H., see p. 1234, infra.
[4] Judge Alprin wrote in this connection that,

the most plausible reading of the section is that a professional who makes a required report pursuant to the statute is not barred by the privilege from testifying in any neglect proceeding concerning the circumstances that prompted the report or the contents of the report that was made. That is quite different, however, from construing the statute as authorization for automatic waiver of the privilege in neglect cases where a parent has a history of mental or physical illness.
116 Daily Wash.L.Rptr. at 2738.
[5] The mother also contends that the evidence was insufficient to support a finding of neglect. We conclude, however, that this contention is without merit.
[6] "A lower court decision must be affirmed if the result is correct, despite the fact that the court `relied on a wrong ground or gave a wrong reason.'" Marinopoliski v. Irish, 445 A.2d 339, 340 (D.C.1982) (quoting Helvering v. Gowan, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224 (1937)); see also Craig v. United States, 551 A.2d 440, 440 n. 4 (D.C.1989) (affirming a criminal conviction on grounds not considered by trial judge). In the present case, we agree with Judge Burgess that reasonable people may [and do] differ as to whether the trial court's reasoning was "wrong," D.H., supra, 117 Daily Wash.L. Rptr. at 2111, infra at 1235, but we are free to affirm for reasons different from those relied on by the trial judge.

Counsel for the mother contends that since neither the child nor the mother cross-appealed from the trial court's judgment, they may not challenge its ruling on the limited reach of § 2-1355. The appellees, however, secured an adjudication of neglect. They were therefore the prevailing parties, and there was no adverse judgment from which they could appeal. As we recently observed in Goodman v. District of Columbia Rental Hous. Comm'n, 573 A.2d 1293, 1302, (D.C.1990) (quoting from United States v. American Railway Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924) (Brandeis, J.)):
[t]he appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.
[7] Disclosure is to be made to the Metropolitan Police Department or to the Child Protective Services Division of the Department of Human Services. D.C.Code § 2-1352(a) (1988).
[8] The language of the statute would be clearer if the legislature had explicitly said in § 2-1355 what we are satisfied that it meant, namely, that the waiver provision applies to a child who is the subject of a neglect proceeding.
[9] See also In re M.M.M., 485 A.2d 180, 182 (D.C. 1984) (mental health diagnosis unreliable where doctor failed to examine patient's prior history during confinements at St. Elizabeths Hospital).
[10] We must therefore disagree with the intimation in O.L. I, supra, 116 Daily Wash.L.Rptr. at 2738, quoted in note 4, supra, that application of § 2-1355 to cases such as this one would result in an "automatic" waiver of the privilege.
[1] D.C.Code § 2-1355 provides:

Notwithstanding the provisions of §§ 14-306 and 14-307, neither the husband-wife privilege nor the physician-patient privilege shall be grounds for excluding evidence in any proceeding in the Family Division of the Superior Court of the District of Columbia concerning the welfare of a neglected child: provided, that a judge of the Family Division of the Superior Court of the District of Columbia determines such privilege should be waived in the interest of justice.
[2] The physician-patient privilege is contained in D.C.Code § 14-307(a) (1989 Repl.), which provides:

(a) In the Federal courts in the District of Columbia and District of Columbia courts a physician or surgeon or mental health professional as defined by the District of Columbia Mental Health Information Act of 1978 (D.C. Code, sec. 6-2001 et seq.) may not be permitted, without the consent of the person afflicted, or of his legal representative, to disclose any information, confidential in its nature, that he has acquired in attending a client in a professional capacity and that was necessary to enable him to act in that capacity, whether the information was obtained from the client or from his family or from the person or persons in charge of him.
[3] D.C.Code § 16-2301(9)(C) (1981) defines a "neglected child" as a child:

whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity....
[4] At the time that the District of Columbia Commissioners submitted their own proposed bill, see infra, The Evening Star, quoting District Deputy Coroner Linwood L. Rayford, Jr., said that "[t]he proposal favored by the District of Columbia Commissioners is `a slightly altered version' of the Children's Bureau model bill introduced in the last session of the House by Representative Multer (D.N.Y.)". Child Abuse Law Forecast, The Evening Star, Nov. 20, 1964, at C-1, col. 5. Mr. Walter Tobriner, President of the Board of Commissioners of the District of Columbia, on his part acknowledged that the Commissioners' proposed bill had its origins in the Children's Bureau model bill. H.R.Rep. No. 744, Letter by Walter Tobriner, 89th Cong., 1st Sess. (1965).
[5] The reference by Rep. Multer to § 14-308 is a mistake, since that section has nothing to do with the physician-patient privilege. Present codification is unchanged, at D.C.Code § 14-307(b)(1) (1989 Repl.).
[6] This is not to say that other kinds of harm to children could not have been the subject of a proceeding in the Juvenile Court to invoke its jurisdiction to aid them and their families. That Court had broad jurisdiction in 1966, which extended to, among other kinds of children, those who

[were] homeless or without adequate parental support or care, or whose parents, guardian, or custodian neglect[ed] or refus[ed] to provide support or care necessary for [their] health or welfare.
D.C.Code § 11-1551(a)(1)(F) (1965 Supp. IV). See generally, In Re Stuart, 72 U.S.App.D.C. 389, 396, 114 F.2d 825, 832 (1940). Despite this broad class of cases which could have been the concern of Congress, its specific focus on physical harm, together with the use of "such child", persuades this Court that the waiver authorization was limited to cases in which doctors were required to make a report.
[7] The full text is quoted supra note 1.
[8] Subsection (e) of Section 16-2315 (1981) of the District of Columbia Code as amended provided as follows:

(e)(1) At any time following the filing of a petition which alleges a neglected child as defined by D.C.Code, section 16-2301(9)(C) the Division may, on its own motion or the motion of any party, for good cause shown, order the mental or physical examination of the parent, guardian, or custodian of the child whose ability to care for the child is at issue.
(2) Following an adjudication that a child is neglected, the Division may, on its own motion or the motion of any party, order a mental or physical examination of the parent, guardian, or custodian of the child whose ability to care for the child is at issue.
(3) The Division may order additional mental examinations to be performed by independent experts upon a showing by any party that a prior examination is inadequate.
(4) The results of the mental or physical examination shall not be admissible evidence in the factfinding hearing unless the allegations contained in the petition set forth facts which support a petition pursuant to D.C.Code, section 16-2301(9)(C).
(5) The results of the mental or physical examination shall be admissible at a dispositional hearing.
(6) The results of the mental or physical examination shall not be admissible as evidence in any criminal proceedings.