684 A.2d 786 (1996)
In re T.G., C.G., D.G., and D.G., D.F., and E.G., Appellants.
Nos. 93-FS-1452, 93-FS-1453, 93-FS-1457, 93-FS-1458 and 93-FS-1523 to 93-FS-1526.
District of Columbia Court of Appeals.
Argued April 26, 1995.
Decided November 14, 1996.
Melissa L. Coretz, Alexandria, VA, appointed by the court, for appellant D.F.
*787 Diane Gaylord, Buffalo, NY, appointed by the court, for appellant E.G.
Michael H. Noyes, Greenbelt, MD, appointed by the court as guardian ad litem, for T.G., C.G., D.G., and D.G.
Sonia A. Bacchus, Assistant Corporation Counsel, with whom Erias A. Hyman, Acting Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for the District of Columbia.
Before WAGNER, Chief Judge, KING, Associate Judge, and MACK, Senior Judge.
MACK, Senior Judge:
The mother and father of four young children challenge, in separate appeals, the findings of a trial court that the children were "neglected" within the meaning of D.C.Code § 16-2301(9)(B) and (F) (1989 Repl. & 1996 Supp.) as well as the court's order committing the children to the Department of Human Services (DHS) for placement in foster homes. Basically, the parents attack the sufficiency of the evidence to support a finding of neglect. In the circumstances of this case, viewing, as we must, the evidence in the light most favorable to the government, see In re S.G., 581 A.2d 771, 774-75 (D.C.1990)(quoting In re T.M., 577 A.2d 1149, 1151 (D.C.1990)), we agree with the parents that the evidence supporting the finding that the children were "neglected" was insufficient as a matter of law.[1] The government did not meet its burden of proof (under D.C.Code § 16-2301(9)(B)) of showing that any failure of proper care was not due to the parents' lack of financial means. In re D.C., 561 A.2d 477, 479 (D.C.1989). On this record, we are disturbed at the rush to judgment exhibited by DHS, which on September 13, 1992, took the children into protective custody (and the following day sought the finding of neglect) based on a single visit to the home of the children. Finally, on the basis of a transcript of an October 1993, dispositional hearing which was requested, but not made a part of this record until after oral argument in this court, we conclude that DHS has not acted adequately to further the basic aim of society's interest in reunification of the family.

I.
This family came to the attention of city officials for the first time on September 13, 1992. On that morning, the children's maternal grandmother died at her residence. An officer, responding to the report of death, found the two older children, T.G. and D.G., in their grandmother's house. The officer later described the house as being in a deplorable state and the children dirty and in need of clean clothes and baths. Shortly thereafter, the children's mother arrived with the two younger children. The officer drove the mother and the four children to the residence of the mother and father; he found that house likewise to be in a deplorable state. The two younger children were also dirty and in need of baths.[2] The officer took all four children into protective custody and carried them to DHS. A social worker visited the two houses the same afternoon and thereafter corroborated the officer's description of the children and their living conditions. The next day, September 14, 1992, DHS filed neglect petitions. The court ordered that all four children be placed in the custody of DHS, pending further action, basing its finding on the inadequacy of the children's living arrangements and their then ages (approximately eight, four, two, and one).
The following year, on September 8, 1993, the trial court conducted a factfinding hearing with regard to the neglect petitions, heard and credited the testimony of the officer and social worker who discovered the family on September 13, 1992, and based its finding of neglect (pursuant to D.C.Code § 16-2301(9)(B) and (F))[3] on the deplorable *788 living conditions. The court did not adopt the reasoning of DHS that the mother and father were unable to discharge their parental responsibilities because of physical or mental disabilities, specifically stating that it did not find respondents to be neglected children pursuant to D.C.Code § 16-2301(9)(C). The mother and father were present at the hearing, did not testify, but moved through counsel for dismissal on the ground that a finding of neglect could not be based upon a lack of financial means (see § 16-2301(9)(B) & (24), supra note 3), and that, therefore, DHS had failed to meet its burden. The trial court rejected the argument of DHS that the burden of showing that the deplorable living conditions resulted from the lack of financial means shifted to respondents; it nevertheless denied the motion to dismiss, holding that DHS had met its burden of proof. On October 26, 1993, the court held a dispositional hearing, indicated its intent to order a home-study and continued the placement of the children under the custody of DHS (with the boys remaining at St. Ann's Infant Home and the girls in foster care of a paternal aunt).

II.
The term "neglect," warranting the protective intervention of the state, is by its very nature the equivalent of "negligence" i.e., implying habits or omissions of duty, patterns of neglect, etc. See WEBSTER'S NEW INTERNATIONAL DICTIONARY, SECOND EDITION 1637 (1948) (emphasis supplied). Thus, we have held that a trial court's inquiry in neglect proceedings must go beyond "simply examining the most recent episode." In re A.S., 643 A.2d 345, 347 (D.C.1994) (quoting In re J.J.Z., 630 A.2d 186, 194 (D.C.1993) (quoting In re O.L., 584 A.2d 1230, 1233 (D.C.1990))). "[T]he judge must be apprised of the entire mosaic." O.L., supra, 584 A.2d at 1233 (quoting In re S.K., 564 A.2d 1382, 1389 (D.C.1989)). Quite obviously, the "entire mosaic" includes an examination of any history of, but also the reasons for, neglect i.e., chronic indifference, carelessness, dereliction, inability to perform, etc.
We have also held that "The purpose of the child neglect statute is to promote the best interests of allegedly neglected children." A.S., supra, 643 A.2d at 348 (quoting In re B.C., 582 A.2d 1196, 1198 (D.C.1990) (per curiam)); see also J.J.Z., supra, 630 A.2d at 191-92; In re J.A., 601 A.2d 69, 76 (D.C.1991) (per curiam). These "interests are presumptively served by being with a parent, provided that the parent is not unfit." S.G., supra, 581 A.2d at 785.
Viewed against this backdrop, the circumstances of the instant case give us cause for concern. All four children were taken into protective custody on the same day (September 13, 1992), that their ailing grandmother died, and that their living quarters were first observed. They were taken into protective custody because they were dirty and their living quarters were dirty. All of the evidence as to parental housekeeping or child care was gathered on that one day in September 1992, and a neglect petition was filed *789 on the following day.[4] It was not until the following year, on October 12, 1993, that the children, on this evidence, were found to be neglected. Meanwhile, it appears that it was not until 1993 that DHS, in preparing for an October 26 disposition hearing, sought to contact these parents to inquire about reunification. At this time, no assessment of the parents' current living conditions had been made and no case plan had been developed. During this period, the parents had visited the two boys at St. Ann's Infant Home on a regular basis (and, presumably, the two girls who were in the care of a paternal aunt).
We are dealing here with parents who have not been found to be "unfit." While the neglect petition alleged incapacity because of physical or mental disabilities, the trial court did not find neglect on these grounds. Moreover, we have recognized that the "relevant focus" for the court in neglect proceedings is the children's condition, not parental culpability. In re B.C., 582 A.2d 1196, 1198 (D.C.1990) (per curiam); see also In re LeShawn R., 114 Daily Wash. L. Rptr. 1109, 1118 (D.C.Super. Ct. April 11, 1986). State intervention is justified only after it is demonstrated that the need arises from some act or failure to act on the part of the parent "which endangers the welfare of the child." LeShawn R., supra. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). In the absence of danger to the physical or emotional health of a child, or the significant threat thereto, the state should be cautious before intervening. See Judith Areen, Intervention Between Parent and Child: A Reappraisal of the State's Role in Child Neglect and Abuse Cases, 63 GEO. L.J. 887, 933 (1975).
The problem in this case arises as a result of DHS's immediate focus on the conditions in two residences on a particular day. One could find empathy for the plight of social workers who, charged with the protection of children, must face the stark realities of poverty in an urban dwelling. One could also argue that constant exposure to filthy living conditions creates the risk of physical deterioration.[5] Not enough focus, however, was centered on the physical or mental condition of the children overall. There was testimony about some skin rash, but also the testimony of a social worker that she had seen many dirty children.[6] There was testimony that there was no edible food in the residences, and that at the time the children appeared to be hungry. Yet, the children bore no signs of malnourishment or abuse requiring medical attention. In fact, there was testimony that the mother had explained that the father used borrowed funds to bring home food every day. There was testimony that the only family income came from a social security check, payable to the mother's father, who in turn gave the mother a certain amount of the funds for her use.
It may well be, as counsel for DHS argued (in opposing the motion to dismiss on the ground that a finding of neglect could not be based upon a lack of financial means), that society cannot bear the burden of funneling massive or minor amounts of money into deplorable housing to permit children to live there.[7] True, also, as counsel argued, "you don't need a lot of money to clean up." It *790 also may well be that overburdened service agencies and court systems are ill-equipped to meet certain problems of society. Nevertheless, here a sympathetic trial court, aware of the problems of substandard housing, rejecting the argument that the father and mother had the burden of proving the lack of financial means, but drawing inferences (on a "close issue") from the government's evidence of filthy conditions, found neglect, noting:
We're talking about a bar of soap, we're talking about a washing of clothes, we're talking about changing of clothes, and even if there is one pair of clothes, these clothes can be washed out overnight.
There is a point, however, when decision-makers may be called upon to draw a balance between a bar of soap and love, and although we are loathe to second-guess the trial court's findings on this score, we nevertheless feel compelled to reverse the finding of neglect because of the failure of the government to meet its burden of proof.
We are also here disturbed by how little DHS did in seeking reunification of this family. It is beyond dispute that even if the parents were less than perfect, DHS has not lived up to its obligations in these proceedings. Although the allegations were made that the mother was learning disabled, and that the father had some substance abuse problems, the trial court's order of neglect made no findings as to unfitness. The court's findings reflected mostly the almost unspeakable poverty in which the family subsisted without the assistance of aid payments from the District. But DHS did not immediately seek to help the parents do what they had to do to reunite their family, according to the record before us. Indeed, in a report prepared in connection with the dispositional hearing scheduled for October 26, 1993, more than a year after the children were removed, DHS noted that it had not called the parents until recently. Although it may have been the parents' failings that brought DHS into the matter in the first place, DHS should not have been satisfied to document that the parents were imperfect. Instead, DHS should have taken an active role in spurring repair of the family by, for example, calling the parents immediatelyand repeatedly, if necessaryto develop a strategy for reunification.
That the parents desired to be reunited with their children is evident from a reading of the transcript of the 1993 dispositional hearing. The father, mother, paternal grandparents, and paternal aunt (caretaker of the two girls) were present. Indeed, the father requested a short delay in proceedings to make certain that his wife, who walked slowly because of a weight problem, would arrive in time. The father sought custody of the boys because "it was better for children to be with relatives than [in an institution]." He told the court that the parents had a home available, but that no one from DHS had come to inspect it. Counsel explained that the mother was living at her father's house and was in the process of "fixing that home up" but had not been contacted by DHS. The children's father spoke of having to stop work in order to help his wife apply for public assistance and his desire to return to work. He indicated that he and his wife customarily visited the boys at St. Ann's twice a week. The trial court, in setting a date for further review, indicated that it would order a home-study before releasing the boys and it ordered that the continued visitation be preserved. In view of our holding that the evidence was not sufficient to support the drastic separation of parent from child in the first instance, it follows that (at least as to the DHS commitment) the question of disposition may be a moot one.
We emphasize that in finding that the government failed to meet its burden of proof (as to neglect), we are not usurping the role of the trial court as a finder of fact. Rather, it is the trial court's conclusion, as a matter of law, that the deplorable living conditions (observed by witnesses on one day of tragedy) were not caused by the lack of the family's financial means, that we find to be unsupported by the evidence.[8] On the other *791 hand, the trial court's finding that the children were not malnourished is supported by the evidence.[9] Moreover, as noted above, the trial court stated explicitly that it did not find the children to be neglected under D.C.Code § 16-2301(9)(C) which deals with the physical and mental incapacity of parents.
Because of the failure of the government to meet its burden of proof that any neglect was not due to the lack of financial needs, we are required to reverse the order with respect to neglect. In so doing, we recognize that the Superior Court, in the ordinary course of events, would order the release of the children from custody. See D.C.Code § 16-2317(b)(2) (1989 Repl.).[10] In view of the intervening lapse of time since the children were taken into custody, however, we reverse the order of neglect, but stay the mandate of termination, to permit the court to review "the need for detention or shelter care" or to allow time for the parties to effect the children's transition to the parents' home or for the District to take such other action as the family's current circumstances and the children's best interest may require.[11]
So ordered.
KING, Associate Judge, dissenting:
Because I disagree with the majority's conclusion that the trial court erred in finding neglect, pursuant to D.C.Code § 16-2301(9)(B) and (F) (1989 Repl. & 1996 Supp.), for each of the four children[1] with respect to both the mother and father, I respectfully dissent.
D.C.Code § 16-2301(9)(B) defines the term "neglected child" as a child "who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian" (emphasis added). D.C.Code § 16-2301(9)(F) defines the term "neglected child" as a child "who has received negligent treatment or maltreatment from his or her parent, guardian, or other custodian." Finally, D.C.Code § 16-2301(24) (1989 Repl.) defines the term "negligent treatment" or "maltreatment" as the "failure to provide adequate food, clothing, shelter, or medical care, which includes medical neglect, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian" (emphasis added). It is these provisions that served as the basis for the trial court's finding of neglect with the italicized language being the main point of contention in this appeal. I disagree with the majority's conclusion that the trial judge erred in finding that the government established, by a preponderance of evidence, that the condition of the children was "not due to the lack of financial means" of the parents.
In In re A.S., 643 A.2d 345 (D.C.1994), we recently reiterated the standard of review *792 applicable here. First, we noted that in a case tried by a judge we will not disturb the judgment except for errors of law, "unless it is plainly wrong or without evidence to support it." Id. at 347 (internal quotations and citations omitted); see also D.C.Code § 17-305(a) (1989 Repl.). Moreover, in a neglect proceeding, "the government is required to prove its case by a preponderance of the evidence . . . [and][w]hen ... a claim of evidentiary insufficiency [is raised on appeal], we are bound to view the evidence in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence." A.S., supra, 643 A.2d at 347. In my view, the majority has ignored these standards by making its own findings of fact based on its interpretation of the evidence.
At the evidentiary hearing the court heard from two witnesses presented by the government, a police officer and a social worker. Neither the father nor the mother testified. The trial judge made the following findings of fact:
1. After hearing the testimony, the Court credits the testimony of the two government witnesses. Based upon this persuasive testimony, this Court finds that the children were residing in deplorable living conditions, which were not the function or product of the parents' lack of financial means.
2. Officer Mathis testified that the grandparent's home was in a deplorable condition. Upon entering the house, he noticed a powerful stench which burned his nose with every breath. This odor emanated around the entire house. He observed piles of clothes and trash strewn about the home. The rug was filthy. There were holes in the floor and ceiling, and there were electrical wires hanging from the ceiling and walls. The officer stated that the entire kitchen was cluttered with trash, and there was the sound of mice in the corner.
3. Officer Mathis further testified that the children were unkempt. The children were not washed and one child's hair was completely matted. Both children were wearing clothes that had the appearance of not being washed for over a period of time. Their bodies emitted a foul odor. The children's room was filled with trash and scattered clothing. There was also one double[-]sized mattress on which all of the children slept.
4. Officer Mathis proceeded to visit the home of the parents. This house was found to be in the same deplorable condition as the grandmother's house. Two of the children found in this house suffered from skin rashes, which are consistent with dirt irritation. Furthermore, all of the children were hungry. Upon inspection of the kitchen, Officer Mathis noted only one item in the freezer and one half-gallon of sour milk in the refrigerator.
5. The Court heard the testimony of Joan Mallory, Department of Human Services Social Worker, who accompanied Officer Mathis into the grandparent's home. Ms. Mallory also had the opportunity to observe the clothing and hygiene of the children. She too stated that each child emitted a strong foul odor. The children slept on a single mattress, which smelled of urine and had no sheets.
Upon examination of the home, she observed spoiled food, dirty utensils and stagnant water in the tub. She further stated that the carpeting and floor were so dirty that it was difficult to distinguish one from the other. The house was in a complete unsanitary condition.
6. The Court also concludes that the condition of the children and the home in which they were living was not caused by parents' lack of financial means. The evidence demonstrated that the family received Social Security Income benefits. The fact that the children were not malnourished further indicated that sufficient food was provided to the children. Whether the family lived in substandard housing is of no significance because it is not the cause of the aforementioned deplorable conditions. The cost of cleaning the home, washing the children, and bathing a child is minimal. Therefore, the filthy conditions of the children and the home were the result of neglect, rather than lack of financial means.
*793 I submit that these findings of fact are supported by the record and this court has no basis for concluding otherwise.
The majority faults the social worker, and inferentially, the trial judge for focusing on conditions on a particular day, i.e., the day that Officer Mathis took the children into protective custody, rather than examining the circumstances "beyond ... the most recent episode." See A.S., supra, 643 A.2d at 347. The majority seems to be saying that neglect was not established because it was only shown that the children and their homes were filthy on a single day in their lives. Setting aside the point that no such argument was ever made to the trial judge, it would not be unreasonable to infer, as the trial judge undoubtedly could and did, that the conditions described had existed for some time before the day they were observed. For example, the social worker testified that the children's clothes were so filthy that they had to be thrown away, and the trial court found that the clothing of at least two of the children "had the appearance of not being washed over a period of time." The social worker also testified that the odor given off by the children was so overwhelming that she had to air-out the office where the children had been taken. Finally, there was testimony that trash was strewn around the homes, the stove and utensils in one of the kitchens were "very very dirty," and both homes emitted a foul odor. This evidence strongly suggests that the condition of the children and the homes was a problem of long standing.
Moreover, the finding on financial ability is supportable based on the testimony regarding the mother's access to the proceeds of a Social Security Income ("SSI") benefits check. The majority places reliance on testimony that the proceeds of the check went to the mother's father who "gave [the mother] a certain amount of money to [take] care of herself," thus implying that the mother only received that portion of the proceeds that her father chose to give her. Ante at 791 note 9. There was also testimony, however, that the beneficiary of the SSI check was the mother, and that her father was the designated payee on her behalf and the proceeds were "solely for her."[2] From this testimony the trial court could conclude that all of the funds from the SSI check went to the mother, a conclusion bolstered by the mother's attorney who, during the course of her argument seeking dismissal of the petition, stated that "the income of that family is the Social Security Income check which is designated for the use of the mother alone," and the absence of any evidence (neither parent testified) that the proceeds of that check were insufficient to allow the parents to purchase minimal cleaning supplies. Indeed the evidence that the children's rooms were filled with trash and their clothing strewn about, problems that could be corrected without any financial cost, supports a conclusion that the condition of the children and their homes were the product of the parents' long-term failure to provide even minimal care for their children rather than from the lack of financial means to correct it. Therefore, because the findings of the trial court are supported by the record, I would affirm its ruling that the government had met its burden of proof in establishing neglect.
The parents also challenge the action of the trial court in placing the children in the custody of the Department of Human Services ("DHS").[3] We do not need to reach that issue because, having reversed the finding of neglect, the majority has no other course than to remand to the trial court with directions to "dismiss the petition and order the [children] released from any detention or shelter care or other restrictions previously *794 ordered." D.C.Code § 16-2317(b)(2) (1989 Repl.). Thus, the question of whether the disposition ordered by the trial judge is supportable has been rendered moot by the majority's reversal of the finding of neglect.
I take no position with respect to the majority's decision to stay the mandate. In light of the majority's opinion that neglect was not established, it is not clear to me exactly what action the trial court can take. I note, however, that on this record it is safe to say that the children's future can only be described as precarious. For example, at the disposition hearing on October 26, 1993, the trial judge had before him a disposition report that stated that the "mother is unable to discharge her parental responsibilities to and for the children. The father is unable to discharge his responsibilities to and for the children because of a physical incapacity [and] drug use...." At the time of the hearing, the two daughters were placed with their paternal aunt and the two sons were in St. Ann's home. The father had no objection to the continued placement of the two girls with the aunt, but sought reunification with the two boys. Counsel for the mother represented that the mother "thought" she was capable of caring for two of the children. The trial judge committed all of the children to the custody of DHS, ordering that the two girls remain with the aunt and the two boys be placed in foster care.[4] Because the majority has reversed the finding of neglect, however, those commitments must be set aside.
NOTES
[1] In a child neglect proceeding, the government is required to prove its case by a preponderance of the evidence. S.G., supra, 581 A.2d at 774.
[2] For a description of the condition of the house and the children on September 13, 1992, see the Findings of Fact and Conclusions of Law of the trial court after a hearing on September 8, 1993.
[3] D.C.Code § 16-2301 reads in pertinent part:

(9) The term "neglected child" means a child:
* * * * * *
(B) who is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian; or
(C) whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity; or
* * * * * *
(F) who has received negligent treatment or maltreatment from his or her parent, guardian, or other custodian.
* * * * * *
(24) The term "negligent treatment" or "maltreatment" means failure to provide adequate food, clothing, shelter, or medical care, which includes medical neglect, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian.
[4] The father of the children expressed his confusion:

Yes, that's what I mean, where did all that [drug testing requirement] come from. If I not home, someone is going to walk into my house, and pull my children out and say they didn't like the way it looked, say its dirty....
[5] As counsel for DHS argued, "[w]e don't need to leave children in deplorable conditions until they get hurt...."
[6] The testimony was elicited from a DHS social worker of three years by DHS's counsel in an apparent attempt to show that the children were more dirty than others. The court sustained an objection.
[7] Counsel argued, "[I]t's up to the parents to prove that because they could not afford the children, they did not know about getting public assistance, they did not know where [to] turn for money, that's why the house was turned into this condition."
[8] The record shows that the only source of family income was a partial social security payment for which the maternal grandfather, not the parents, was the payee, and that the payee doled out some portion of the check to the mother.
[9] The government's evidence showed the family was borrowing money to feed the children.
[10] D.C.Code § 16-2317(b)(2) reads in pertinent part:

After a factfinding hearing on the allegations in the petition, the Division shall make and file written findings in all cases as to the truth of the allegations, and in neglect cases, he shall also make and file written findings as to whether the child is neglected. If the Division finds that
* * * * * *
(2) in the case of a need of supervision or neglect petition, that the allegations have not been established by the preponderance of the evidence, the Division shall dismiss the petition and order the child released from any detention or shelter care or other restriction previously ordered. If the proceedings are not terminated after the factfinding hearing, the Division shall review the need for detention or shelter care of the child.
(Emphasis added.)
[11] We recognize that the parents' circumstances may have changed since the factfinding hearing. For example, we do not know whether the parents remain in a position to assume the care of the children immediately. The time provided by a stay of the mandate will permit the District and the court time to consider any action warranted under the present circumstances. See D.C.Code § 16-2317(b)(2).
[1] The children, two girls and two boys, were born on May 3, 1984, February 8, 1988, April 16, 1989, and July 31, 1990.
[2] Whether such an arrangement formally existed cannot be determined from this record; however, the disposition report indicates that the mother was "unable to discharge her parental responsibilities... because of mental incapacity." Whether the mother's mental condition was such that it was necessary to designate someone to receive the benefits check on her behalf also cannot be determined from this record.
[3] The record in this case consists of the transcripts of the fact-finding and the disposition hearings, the order of the trial court finding that neglect had been proven, the disposition report, some procedural motions and orders, and little else. In my view the record is not sufficiently extensive to allow us to conclude, as the majority does, that DHS did not adequately discharge its responsibilities to this family.
[4] A home study was also ordered, and the matter was continued for further proceedings, apparently to determine whether the parents' home was suitable for a return of some of the children. The record does not reveal what, if any, further actions were taken with respect to their placement.