697 A.2d 1189 (1997)
A.J. et al., Appellants,
v.
L.O., Appellee.
No. 95-FM-1225.
District of Columbia Court of Appeals.
Argued April 8, 1997.
Decided May 29, 1997.
*1190 Patrick K. O'Keefe, with whom Christoper J. Herrling and Melissa G. Reinberg, Washington, DC, were on the brief, for appellants.
Janis O'Connor, Germantown, MD, for appellee.
Before FERREN, STEADMAN, and RUIZ, Associate Judges.
FERREN, Associate Judge:
A.J. and S.J. ("plaintiffs") appeal from the trial court's dismissal of their action seeking custody of their four biological children, who were legally adopted in 1989 by appellee, L.O., and his now-deceased wife, B.O. The trial court concluded that plaintiffs, whose parental rights had been terminated in the 1989 adoption decree, were legal strangers to the children and thus had no standing to sue for custody under District of Columbia law. We affirm on the alternative ground that plaintiffs failed to allege in their complaint facts sufficient to compel removal of the children from L.O's custody and their placement with plaintiffs.

I.
Plaintiffs' October 11, 1994 complaint alleged the following: On September 26, 1989, L.O. and his wife, B.O., adopted plaintiffs' children in a proceeding in Montgomery County, Maryland, that terminated plaintiffs' parental rights. The children previously had been placed in L.O.'s and B.O.'s foster care because plaintiffs' mental illnesses prevented them from providing the children with appropriate care. After the adoption, plaintiffs were permitted to visit the children on a regular basis, and plaintiffs accordingly maintained a close relationship with L.O., B.O., and the children  until the death of B.O. in 1991.[1] After B.O. died, L.O. became less cooperative in allowing such visits, and the relationship between L.O. and the plaintiffs deteriorated. According to the complaint, L.O. now permits only "sporadic contact" between plaintiffs and the two elder children and none at all with the two younger children.
The complaint further alleged that L.O. was "elderly and in failing health, and [was] no longer able to appropriately care for the children's needs." Plaintiffs added that they were undergoing treatment for their mental illnesses, and that their treatment regimes had made them fit to regain custody of the children. Finally, plaintiffs said that their youngest child, F.J., who previously had been in foster care, had been returned to their custody, and that they provided adequate and appropriate care for that child.[2]
L.O. responded to the complaint by filing a motion to dismiss or, in the alternative, for a more definite statement. L.O. argued that plaintiffs lacked standing because their parental rights had been terminated and, as a result, they were legal strangers to the children. L.O. also argued that the complaint failed to specify with sufficient particularity why the children should be removed from L.O.'s care and why plaintiffs would be the appropriate parties to take over custody.
Judge von Kann denied L.O.'s motion to dismiss, concluding that, although plaintiffs' parental rights had been terminated, "nothing in the law prevents a non-parent from filing an action for custody." The judge, however, ordered plaintiffs to file a supplement to their complaint detailing why L.O. was unfit and what changes in material circumstances required a transfer of custody. Plaintiffs filed the required supplement, adding several paragraphs allegedly demonstrating L.O.'s unfitness as a parent.
Specifically, the supplement said the children had told plaintiffs that "they were not bathed on a regular basis." Plaintiffs further alleged they had observed first-hand that L.O.'s backyard was "covered in glass" and that one of the children had received a gash *1191 on the head from playing there. Plaintiffs also saw, during a visit to L.O.'s house, another of the children attempting to drink bleach. Finally, plaintiffs reiterated their belief that L.O.'s health was failing, adding that "he has trouble keeping up with the boys." The fundamental change of circumstances plaintiffs cited to justify a change in custody was the death of B.O. and the subsequent deterioration of the relationship between plaintiffs and L.O.
L.O. then filed an amended motion to dismiss, contending that plaintiffs' "continued failure ... to state with sufficient specificity the factual bases for their petition for custody" warranted dismissal of the complaint pursuant to Super. Ct. Dom. Rel. R. 12(b)(6). At a hearing on June 12, 1995, Judge Queen, who had replaced Judge von Kann, granted L.O.'s motion to dismiss, indicating that she would issue a written order soon thereafter. The order was docketed on July 27, 1995; it dismissed the case on the ground that plaintiffs, as legal strangers, had no right to sue for custody. Judge Queen concluded:
[Plaintiffs'] allegations as to parental neglect or unfitness should be placed before Child Protective Services or the Department of Human Services to investigate [and] if, in fact, the children are endangered by any infirmity or inability of their father, they would take the appropriate action[,] and the appropriate action, of course, is dictated first by family placement. The family placement being, the relatives as acquired through the adoption process, that is, relatives of [L.O.]. . . .
Plaintiffs filed a timely notice of appeal on August 31, 1995.[3]

II.

A.
We begin our discussion by noting two points of apparent agreement between plaintiffs and L.O. First, L.O. does not press on appeal the argument rejected by Judge Von Kann but adopted by Judge Queen: that plaintiffs, as legal strangers to the children, have no standing to sue for custody.[4] Because L.O. concedes that a legal stranger to a child has standing to file a complaint for custody of the child, and because we conclude that plaintiffs' complaint was legally insufficient in any event to withstand the motion to dismiss, we decline to rule on the standing issue and affirm on the alternative ground.[5]
Second, the parties agree that the termination of plaintiffs' parental rights in the adoption proceeding changed plaintiffs into legal strangers (though, of course, not *1192 strangers in fact) to their biological children, and that for legal strangers to gain custody from a parent they must allege "unfitness, abandonment, or some other special circumstances." We concur that, in this case, where the children had been living with their legal parent[6] for approximately five years at the time the complaint was filed, plaintiffs at the very least would have to prove parental unfitness to regain custody of their biological children.[7]

B.
L.O. argues that plaintiffs have failed to allege with sufficient particularity the existence of facts that would support a finding that L.O. was unfit and would warrant a change of custody to plaintiffs. We agree and thus affirm the order of dismissal. "In all complaints for custody of minor children, the circumstances constituting grounds for custody shall be stated with particularity." Super. Ct. Dom. Rel. R. 7(a)(3). Plaintiffs have fallen well short of this requirement. As detailed above in Part I., plaintiffs alleged a handful of isolated events that purportedly demonstrate L.O.'s unfitness: there was glass in L.O.'s backyard where the children play; one of the children was cut playing in that yard; one of the children attempted to *1193 drink bleach on one occasion and plaintiffs, who were visiting the children at L.O.'s home, prevented it; the children were not bathed regularly; and L.O. was in failing health and unable to keep up with the children. We think it noteworthy that none of plaintiffs' allegations contains any indication as to when these events occurred; thus, it is impossible to conclude that L.O.'s purported unfitness existed at the time the complaint was filed.
Even assuming the truth of these allegations, however, they hardly present a compelling case for taking the children away from their parent with whom they have lived for many years. We should not even require a parent to answer a complaint for custody, filed by a legal stranger to the child, based on such vague, conclusory allegations. These events  a child cutting his head playing in the yard and another child attempting to drink a household cleaning item  are so commonplace that if we permitted this complaint to go forward, it would be the rare parent indeed who could not be vulnerable to traumatic, time-consuming, and expensive litigation by legal strangers alleging similar occurrences. If legal strangers are to be permitted to sue for custody at all, see supra note 5, they are required to allege specific facts, that, if proved, would compel removing the child from the child's current environment. Given that plaintiffs' allegations do not meet that standard, we affirm the trial court's order. Compare In re T.G., 684 A.2d 786, 787-89 (D.C.1996) (reversing neglect finding based on deplorable living conditions of children taken from only one observation of unsanitary household, even though these conditions developed over time and children suffered from skin rashes from the dirt and filth) with In re L.L., 653 A.2d 873, 881-83 (D.C.1995) (reversing denial of adoption petition, including termination of parental rights, directed at father who had been convicted of taking indecent liberties with stepdaughter and had history of criminal conduct, homicidal ideation, and attempted suicide).
Affirmed.
NOTES
[1] Although Maryland law permits open adoptions whereby the parties formally agree to allow the natural parents visitation rights, see Weinschel v. Strople, 56 Md.App. 252, 466 A.2d 1301, 1305-06 (Spec.App.1983), plaintiffs' visitation arrangement was informal, not contractual.
[2] F.J.'s status is not at issue in this case. The averments in the complaint concerning F.J. appear designed to demonstrate plaintiffs' fitness to regain custody of the four children adopted by L.O.
[3] Because the order was entered "out of the presence of the parties and counsel," the thirty-day period for filing the notice of appeal did not begin to run "until the fifth day after the Clerk of the Superior Court has made an entry on the docket . . . reflecting the mailing of notice by that clerk," excluding weekends and legal holidays. D.C.App. R. 4(a)(3); see Singer v. Singer, 583 A.2d 689 (D.C.1990) (holding that because fiveday period under D.C.App. R. 4(a)(3) was separate from thirty-day period for filing appeal, weekends and holidays were not counted in five days). Thus, plaintiffs had thirty days from August 3, 1995 to file their notice of appeal.

We note that Brees v. Kelly Adjustment Co., 302 A.2d 214 (D.C.1973) (per curiam), said that the previous Rule 4 II(a)(3) "applies when the court takes a matter under advisement and thereafter renders its decision out of the presence of the parties or counsel" but not in cases "where the judgment was rendered in open court." Id. at 215. If Brees applied here, therefore, the appeal would have been untimely. Brees, however, was decided under a previous version of the rule which provided for three additional days where "`a judgment or final order is entered or decided out of the presence of the parties and counsel and without previous notice to them of the court's decision.'" Id. at 215 (emphasis added) (quoting old Rule 4 II(a)(3)). The italicized language was deleted when the rule was amended, so the rule now applies whenever the judgment or final order is "entered or decided out of the presence of the parties and counsel," D.C.App. R. 4(a)(3), even if, as in this case, the parties were on notice of the judge's decision but were awaiting a written order.
[4] L.O. attempts to read into Judge Queen's order a ruling that plaintiffs lacked standing because they failed to aver sufficient facts to demonstrate that L.O. was unfit and that plaintiffs were the proper parties to receive custody. The language from Judge Queen's order quoted in the text above, however, makes clear the judge ruled that plaintiffs should take all their allegations of child neglect to the District government because plaintiffs, as legal strangers to the children, had no standing to bring a complaint for custody even if the current custodians had neglected or abused the children.
[5] We add that the standing of a legal stranger to a child to bring a complaint seeking the child's custody is not at all obvious. Shelton v. Bradley, 526 A.2d 579 (D.C.1987), cited by plaintiffs and Judge von Kann's order for the proposition that "nothing in the law prevents a non-parent from filing an action for custody," does not stand for that proposition. In Shelton, the natural father brought a habeas corpus proceeding demanding custody of his daughters, who had been living with their grandmother after their mother's death. See id. at 580-81. Shelton said nothing about whether the grandmother, arguably a legal stranger, could have brought a custody action in the first instance.

The District of Columbia has enacted the Uniform Child Custody Jurisdiction Act. See D.C. Law 4-200 (1983) (codified as amended at D.C.Code § 16-4501 to -4524 (1989 Repl.)). That law defines a "[p]etitioner" as "a person including a parent, who claims a right to custody or visitation rights with respect to a child." D.C.Code § 16-4502(10). Judge Queen found that plaintiffs, by virtue of their status as "legal strangers," had no "right to custody" and, for that reason, had no standing to bring a claim under the Act. The judge did not deal with the potential standing implications of plaintiffs' alleged informal arrangement for visitation with the children. See supra note 1. We express no view on the correctness of the judge's "standing" analysis or on the applicability or proper scope of the statutory term "petitioners."
Likewise, we express no view as to appellant's argument that the "law of the case" doctrine gave finality to Judge von Kann's ruling on standing and thus bound Judge Queen.
[6] Under both District of Columbia and Maryland law, L.O. became the "natural parent" of the children at the time of the adoption. "A final decree of adoption establishes the relationship of natural parent and natural child between adopt[e]r and adoptee for all purposes...." D.C.Code § 16-312 (1989 Repl.); accord Md. Code Ann., Est. & Trusts § 1-207(a) (1991). L.O. is entitled, therefore, to the same legal presumption of custody that all other natural parents have, including the provision that when one parent dies, "the natural guardianship devolves upon the other." D.C.Code § 21-101(a) (1989 Repl.).
[7] This court's child custody cases manifest a tension between older decisions that apply a "fitness" test and more recent ones that focus instead on the "best interests of the child." Compare Johnson v. Lloyd, 211 A.2d 764, 765 (D.C.1965) ("The established rule in this jurisdiction is that one who would withhold a child from its natural parent has the burden of proving that the natural parent is unfit to have custody and that the child's welfare compels awarding custody to the nonparent.") with In re K.A., 484 A.2d 992, 997 & n. 2 (D.C.1984) (applying "best interests of the child" test to termination of parental rights where natural father refused to consent but never had had custody of child); see also Shelton, 526 A.2d at 580 n. 3 (recognizing the two lines of child custody cases but declining to resolve conflict). We believe that however that conflict ultimately is resolved, it remains clear that, where a natural parent has physical and legal custody of a child, the best interests of the child will require the court to leave that child with the parent unless that parent is found to be unfit. See, e.g., In re H.R., 581 A.2d 1141, 1160 (D.C.1990) (per curiam) (Ferren, J., concurring); id. at 1183-85 (Rogers, C.J., concurring); In re N.M.S., 347 A.2d 924, 927 (D.C.1975) (per curiam) (noting that mother "ordinarily" cannot be deprived of custody of child without showing of unfitness, but applying best interests test where mother was "seeking to regain  not retain  custody"); cf. Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554-55, 54 L.Ed.2d 511 (1978) ("We have little doubt that the Due Process Clause would be offended `[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" (quoting Smith v. Organization of Foster Families, 431 U.S. 816, 862-63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment))).