**DISTRICT OF COLUMBIA, Appellant,**

v.

**Van HARRIS, as Personal Representative of the Estate of Tezia Allen, and as parent of Vann Allen, a minor, Appellee.**

Nos. 95–CV–1382, 95–CV–1775.

District of Columbia Court of Appeals.

Argued Oct. 21, 1997.
Decided April 12, 2001.

83

Donna M. Murasky, Assistant Corporation Counsel, with whom Jo Anne Robinson, Interim Corporation Counsel at the time the brief was filed, and Charles L.

Reischel, Deputy Corporation Counsel, and Charlotte Bradley, Assistant Corporation Counsel, were on the brief, for appellant.

Carolyn J. Israel, with whom Patrick J. Christmas was on the brief, Washington, DC, for appellee.

Before WAGNER, Chief Judge, and TERRY and FARRELL, Associate Judges.

Wagner, Chief Judge:

On June 9, 1992, Tezia Allen, who was not quite two years old, was beaten to death by her mother's live-in male companion, Eustus Smith. Smith was convicted of criminal charges arising out of the murder. At about the same time, Tezia's brother, Vann Allen, was the victim of physical abuse in the home. The children's father, Van Harris, on behalf of Vann and as personal representative of Tezia's estate, filed a complaint for damages against the District of Columbia and Eustus Smith related to Tezia's death and Vann's injuries. A jury returned a verdict for the estate in the amount of $250,000 and for Vann in the amount of $150,000. The District argues for reversal on the principal ground that it was entitled to judgment as a matter of law because the evidence failed to establish negligence on its part which would render it liable for the intervening criminal acts of Smith. Alternatively, the District contends that Harris failed to present expert testimony which was required to establish the standard of care. It also argues that the damages awarded to the estate and for the minor child, Vann, were excessive and that as to Vann, the evidence was insufficient to support a finding that his injuries were proximately caused by the District. We affirm the judgment in favor of the estate against the District, but reverse the judgment against the District as to Vann's claims.

## I.

### A. *Factual Background*

The evidence at trial showed that Harris went to the home of the children's mother to pick up the children for a visit on or about May 19, 1992. According to Harris, the home was filthy, and he noticed "three silver [dollar] size bruises on [Tezia's] head ... [o]n her forehead and on the right cheek.... She had like three silver dollar size blotches." He questioned the children's mother about the bruises, and she responded that Tezia had fallen out of the bed. Later, when he undressed and bathed the children, Harris noticed a "hand size blotch in the middle of [Tezia's] chest," small scratches over her chest, stomach and back, and two additional silver dollar shaped bruises on her lower back. Harris found similar scratches on Vann's chest and back. When he asked Vann about these injuries, he responded "my daddy at home, belts us a lot."

Harris returned the children to their mother a few days later and went "downtown" immediately afterwards to report the children's condition. He said that he did not keep the children with him because the mother had custody, he thought she would complain to the police if he did, and he feared being charged with kidnaping. Harris testified that he went into two to three different buildings before being directed to one where he could report child abuse. Harris spoke to Phyllis Ferguson, a supervisor at "Child Welfare and Paternity," to whom he reported that the children were neglected and abused. He testified that he told her about the blotches on their bodies, his son's statement about the abuse, and the condition of their home, which he described in testimony as filthy. Harris said that he spoke with Ms. Ferguson fifteen to twenty times over a one

month period seeking assistance. Mr. Harris also contacted the Metropolitan Police Department regarding his concerns.

The deposition testimony of Detective Cervantiz Burke of the Metropolitan Police Department, who subsequently became involved in the investigation, was read into evidence at trial. According to her testimony, she went to the children's home on May 28th to investigate. There, she interviewed the children's mother, who denied Harris' allegations and said that she had not seen him since January. Although she had no specific recollection of removing the children's clothing to examine them, Detective Burke stated that "I would have had to look to find out if they had marks or bruises," and the report stated that "the examination of the Respondent and sibling didn't reveal any marks or bruises." When shown a photograph of Vann's hand taken after Tezia was found dead, showing a burn, Detective Burke stated that had the hand appeared like that during her visit to the home, she would have taken the children. The detective concluded that the allegations were unfounded, and the investigation was closed.

Smith was in the home when Detective Burke investigated, and he testified about the conditions there at the time and the manner in which the detective performed her investigation. Smith testified that the mother returned home from work early and started to clean in anticipation of the detective's arrival, but Detective Burke arrived within a few minutes. According to Smith, Detective Burke remained in the apartment for about fifteen to twenty minutes. She did not go into the bedroom or the kitchen, although one could see the kitchen from where the detective was standing. Smith testified that she did go into the bathroom, which "was filthy." He

said, "[s]he came back checked the kids then she asked two questions and that was it." Smith stated that the questions were whether he lived in the apartment and whether the mother was on welfare. Smith testified that the detective did not speak to the children privately or ask them any questions, even though Vann was old enough to respond and could speak well. Smith described the detective's inspection of the children in this way:

> She looked like she was rushing to check them and go ahead and go, do whatever she had to do. When she did they were standing side by side, . . . . What she did she just lift the shirt up, see what was there and that was it. Checked Tezia the same way and that was it and she went on about her business.

Smith testified that she never looked at Vann's hand, which had a burn on it which had been there for a couple of days.[1] He said that Detective Burke examined Tezia's back, but never asked about a bruise that was on her back, which Smith said resulted from the mother striking the child with a paint brush. Eleven days later, on June 9, Tezia Allen was beaten to death by Smith.

The parties stipulated to certain facts which were presented to the jury. First, they stipulated that "it is undisputed that Tezia Allen was beaten [to] death by an assailant." Second, they stipulated that

> pursuant to the prevention of child abuse and neglect act when report of child abuse or neglect is made[,] the Child Protective Services Division of the District [Department] of Human Services[,] the District of Columbia through [its] agent, servants and/or employees is required to make certain determinations and take certain immediate actions to safeguard the right and protect the wel-

---

1. Smith denied that either he or the mother caused the injury to the child's hand.

fare of children who[se] parents aren't able to do so.

Finally, the parties stipulated that

> the Metropolitan Police Department Youth Services Division is the agency responsible for investigating reports made of children who are being abused. And the Department of Human Services is the agency responsible for investigating reports made of children who are being neglected in the District of Columbia.

### B. *Trial Court Rulings*

The District moved for judgment as a matter of law at the conclusion of Harris' presentation of the evidence, which the trial court denied. The jury returned a verdict for Harris, and the District filed a post-trial motion for a judgment notwithstanding the verdict or in the alternative, for a new trial or remittitur, which the trial court also denied. In denying the motions, the court determined that the fact pattern presented fell within the exception to the public duty doctrine outlined in *Turner v. District of Columbia*, 532 A.2d 662 (D.C.1987), because of the special relationship established through the complaint and the mandatory functions of the prevention of child abuse statutes. *See* Prevention of Child Abuse and Neglect Act of 1977, D.C. Law No. 2–22, D.C.Reg. 3341 (1977), *as amended*, D.C.Code §§ 6–2101 through – 2127 (1995). The trial court concluded that there was evidence from which a reasonable juror could find that the District had a continuing duty, that it breached that duty, and that there was a foreseeable link between the negligent performance of that duty and the resulting harm to the children. The trial court also ruled that the award of damages was not excessive and denied the District's request for a new trial or remittitur.

## II.

Harris's claims against the District are based upon a negligence theory. Therefore, we start with the familiar proposition that to establish negligence a plaintiff must prove " 'a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach.' " *Turner, supra*, 532 A.2d at 666 (quoting *District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C. 1984) (citations omitted)). Focusing first on the duty of care, as a general rule, there is no individual right of action for damages against the government for failure to protect a particular citizen from harm caused by the criminal conduct of another. *Morgan v. District of Columbia*, 468 A.2d 1306, 1310–11 (D.C.1983) (en banc) (citations omitted). A narrow exception to this no-liability rule has been recognized where, for example, "the police by their actions affirmatively undertake to protect an individual under circumstances creating a special relationship or there is a statute or regulation which mandates protection of a particular class and where the individual justifiably relies upon such undertaking of the police, or the statute or regulations...." *Id.* at 1315. Pertinent to this case, in *Turner, supra*, we held that the Child Abuse Prevention Act imposes "upon certain public officials specific duties and responsibilities which are intended to protect a narrowly defined and otherwise helpless class of persons: abused and neglected children." *Turner, supra*, 532 A.2d at 668. Thus, when abused and neglected children have been individually identified to the government agency charged with their protection, then a duty, although narrow and specific, is created by statute to benefit the individually identified persons. *Id.* at 673. In *Turner*, we held that evidence sufficient to permit a reason-

able juror to find that the District was negligent in fulfilling a special duty under the Act would support a claim for damages proximately resulting from such breach. *Id.* at 674–75.

The District does not seem to challenge on appeal that a special duty arose under the circumstances presented.[2] Rather, it contends that the evidence showed that it satisfied any potential duty imposed by the Act. Specifically, it argues that: (1) the District's employees investigated the complaints of abuse with reasonable promptness; (2) the detective's investigation and disposition of the complaint was adequate; and (3) it had no legal duty to refer the case to the Child and Family Services Division (CFSD) of the Department of Human Services (DHS) because the investigating detective's supervisor said that he would have concluded that Harris' report of abuse was "unfounded," and the law requires the police department to contact DHS only for supported reports of abuse.

▉ The District's first two arguments are essentially a challenge to the factual determinations apparently made by the jury in rendering verdicts for Harris. In support of these arguments, the District points out that "none of the three detectives ... who investigated ... Mr. Harris' report to the MPD can be faulted for not physically locating Vann and Tezia," and that "Detective Burke, who interviewed the children's mother and Smith, and who inspected Tezia and Vann, cannot be faulted for concluding ... that Mr. Harris' report of child abuse was unfounded." In support of this argument, the District points to evidence that the officers had difficulty locating the children within the first twenty-four hours of the report because Harris provided an incorrect address, and therefore, they were not negligent in failing to intervene to protect them during this period. However, there was evidence from which the jury could have determined that the District's negligence occurred after the initial period. The children remained in the home for almost a month between the time of this initial report of neglect and abuse and the time that Tezia was murdered and Vann was observed with a burn on his hand. Detective Burke ultimately found the children in their home and had an opportunity to inspect the children and their living conditions.

Focusing on the investigation, the District argues that the detective cannot be faulted for determining upon investigation that the complaint was unfounded. It cites again the bad address that Harris gave, the absence of bruises and red spots all over their bodies as he had reported, the mother's negative responses about Harris, and the detective's account of the children's condition as best as she could recall it, aided by her report. However, the jury was at liberty to reject the detective's account and rely instead upon other evidence supporting Harris' claims. Harris reported to the authorities that he observed marks indicative of physical abuse on the children, and according to Smith, Vann had a burn on his hand and Tezia had a mark on her back inflicted by a paint brush at the time when the detective observed them under deplorable living conditions. Indeed, the District concedes in its brief that "[a]t worst, from the District's stand point, Vann had 'like a little burn' on one hand, ... and Tezia had a bruise on her back, which could have been accidental." Smith also testified that the detective who investigated appeared to be in a hurry and failed to ask Vann any ques-

2. In a footnote, the District states that "[al]though the District relies on *Turner* in this case, the District's position continues to be that *Turner* was wrongly decided."

tions, and the detective described her own examination as cursory. Thus, the jury could have inferred reasonably that the detective, in her haste, failed to see that which was there to be observed and failed to investigate adequately the allegations that the children were the victims of abuse and neglect. There was also evidence that Vann explained to Harris the marks that Harris observed during his visit by saying that Smith belted them a lot, which Harris testified that he reported.

The District's third argument similarly rests on the resolution of factual issues. In contending that there was no legal duty to refer the case to DHS because unfounded reports need not be reported, it relies on (or assumes) the jury's acceptance of the District's version of the facts, when there was a differing version.

 It is the jury's province, and not the court's, to weigh the evidence and to determine the credibility of witnesses. *Etheredge v. District of Columbia*, 635 A.2d 908, 917 (D.C.1993) (citing *Rich v. District of Columbia*, 410 A.2d 528, 534 (D.C.1979)). "When there is some evidence from which jurors could find the requisite elements of negligence, or when the case turns on disputed facts and the credibility of witnesses, the case must be submitted to the jury for determination." *Lyons v. Barrazotto*, 667 A.2d 314, 320 (D.C.1995) (citing *Washington Welfare Ass'n. v. Poindexter*, 479 A.2d 313, 315 (D.C.1984) (other citation omitted)). A case may not be taken away from the jury and decided as a matter of law if an impartial juror could find reasonably that the evidence was sufficient to support the verdict. *Etheredge*, 635 A.2d at 916 (citing *Finkelstein v. District of Columbia*, 593 A.2d 591, 594 (D.C.1991) (en banc)). In determining whether a case should be taken from the jury and judgment entered as a matter of law, the evidence must be viewed in the light most favorable to plaintiff, giving plaintiff the benefit of all reasonable inferences. *Etheredge*, 635 A.2d at 915. Under that standard, cases are rare where issues of negligence and proximate cause can be taken from the jury and decided by the court as a matter of law. *Lyons*, 667 A.2d at 320 (citing *Oxendine v. Merrell Dow Pharms.*, 506 A.2d 1100, 1103 (D.C. 1986) (quoting *Rich*, 410 A.2d at 532)). This is not one of those unusual cases. The issues here involve factual matters within the jury's province. "As an appellate court we have no power to retry factual issues; our authority is restricted to a review for errors of law." *Sachs v. Eller*, 89 A.2d 644, 645 (D.C.1952); *see* D.C.Code § 17–305(a) (1997).

The District also argues that as a matter of law Detective Burke was not negligent, a conclusion it contends is compelled by this Court's decision in *In re T.G.*, 684 A.2d 786 (D.C.1996). In *T.G.*, the parents challenged the finding of the trial court that their children were neglected within the meaning of D.C.Code § 16–2301(9)(B) and (F).[3] We reversed the finding of neglect because the government had failed to meet its burden of establishing that the neglect was not due to the lack of financial

---

**3.** D.C.Code § 16–2301(9)(B) (1997) defines a neglected child as one "who is without proper parental care ... subsistence ... or other care ... necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian." D.C.Code § 16–2301(9)(F) (1997) includes as a neglected child one "who has received negligent treatment or maltreatment from his or her parent, guardian or other custodian." The terms negligent treatment or maltreatment involve "a failure to provide adequate food, clothing, shelter or medical care ... and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian." D.C.Code § 16–2301(24) (1997).

means, as required by the statute. *T.G.*, 684 A.2d at 791. Comparing the adverse conditions of the children's home as described in *T.G.* with the physical conditions of the apartment in this case,[4] the District argues that it had no duty to remove the children from the home since their physical living conditions were not as severe as those described in *T.G.*, where the court suggested caution to the government in intervening, absent danger to the physical or emotional health of a child. *Id.* at 789. *T.G.*, however, provides no support for the District's argument that it is entitled to judgment as a matter of law. Unlike the present case, *T.G.* did not involve allegations of physical abuse nor evidence that signs of physical abuse could be observed on the children when the DHS workers investigated.[5] The decision in *T.G.* turned on a failure of proof of an element of neglect, *i.e.*, that the children's deprivation was not due to the parents' lack of financial means.

### III.

The District argues that expert testimony was required to establish the applicable standard of care for police officers investigating reports of child abuse and neglect.

Harris did not present expert testimony on the standard of care; therefore, the District argues, Harris failed in his proof of negligence.[6]

In a negligence case, the plaintiff has the burden of establishing a standard of care and that defendant's deviation from that standard proximately caused plaintiff's injuries. *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988) (citing *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984) (other citation omitted)). Expert testimony will be required where "the subject in question is so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987) (citing *District of Columbia v. White*, 442 A.2d 159, 164–65 (D.C.1982) (other citation omitted)).

Harris argues that the applicable standard of care was established, in part, through the Metropolitan Police Department Youth Division Handbook. He contends that the Handbook sets forth the responsibilities of the District's detectives in responding to situations of the type involved here. He also contends that

4. In *T.G.* the DHS workers found two of the children at the home of their grandmother, who had just died, dirty, apparently hungry and without food. *T.G., supra*, 684 A.2d at 789. A social worker drove the two children to their parents' home and found it to be in deplorable condition, and observed two younger children in the home dirty. *Id.* The next day, DHS filed a petition for neglect. *Id.*

5. The conditions in *T.G.* were described as follows:

An officer, responding to the report of death, found the two children, T.G. and D.G., in their grandmother's house. The officer later described the house as being in a deplorable state and the children dirty and in need of clean clothes and baths. Shortly thereafter, the children's mother arrived with the two younger children. The officer drove the mother and the four children to the residence of the mother and father; he found the house likewise to be in a deplorable state. The two younger children were also dirty and in need of baths. The officer took all four children into protective custody and carried them to DHS. *In re T.G., supra*, 684 A.2d at 787 (footnote omitted).

6. Harris contends that the District failed to raise this argument in the trial court, and therefore, it is waived. Although the District did not raise the issue in its post-trial motion for judgment as a matter of law, it raised the issue briefly in its motion for judgment during the course of the trial. Therefore, we will consider the issue properly before us for review.

there was evidence from the District's agents concerning the required procedures and the detectives' failure to abide by the procedures. Rules of this type may provide evidence of a standard of reasonable care. *Washington Metro. Area Transit Auth. v. O'Neill,* 633 A.2d 834, 841 (D.C. 1993). The provisions of the Handbook upon which Harris relies are set forth in part in the footnote of this opinion.[7] The District does not argue that the Handbook provides no evidence of negligence. Rather, it contends that there is no evidence that the District's workers violated the provisions of the Handbook. Yet, there was evidence, as previously indicated, from which a jury could determine that, inconsistent with the manual, the detective conducted an examination of the children and their conditions insufficient to reveal obvious injuries and neglect. Absent a reasonable assessment of their condition, the District's employees could not conform their conduct to the requirements of the cited manual and take any steps for the children's protection. Similarly, there is a factual basis for the conclusion that the detective's belief that the allegations of abuse were not supported was contrary to the evidence credited by the jury. In addition, the parties stipulated that the Prevention of Child Abuse and Neglect Act requires immediate actions on the part of the District when abuse or neglect is reported to Child Protective Services (CPS), which was not done. There was evidence that when an allegation of abuse or neglect is supported, the police must make a report to CPS. Moreover, we are not persuaded that the circumstances of this case do not fall within the "common knowledge" exception to the expert testimony requirement. *See District of Columbia v. Hampton,* 666 A.2d 30, 35 (D.C.1995) (citing *O'Neil v. Bergan,* 452 A.2d 337, 342 (D.C. 1982)). A jury could determine whether the District was negligent in failing to exercise reasonable care to protect two children, who the evidence showed, particularly when viewed most favorably to plaintiff, were obviously injured and at risk

---

7. Among the provisions of the Handbook pertinent to Harris' argument are the following:

> When the safety or welfare of a child is in question and the lack of ... livable environmental conditions, or medical attention suggests that the child may have to be removed from the situation, a Youth Division Investigator shall respond to the location of the child to assess the situation and insure the safety and welfare of the child.

> 3 * * * * * *

> The Youth Division Investigator shall handle the complaint as an "Immediate Danger Child Neglect" when an assessment on the scene reveals that the health, safety, or welfare of the child requires the immediate removal of that child from the present surroundings, and appropriate assistance from Child and Family Services cannot be provided to correct or alleviate the situation.

> 3 * * * * * *

> The Youth Division Investigator shall handle a complaint as an "Otherwise Endangered Child Neglect Case" when, after consultation with a representative from Child and Family Services on the scene, it is decided that the removal of the child from the present situation by the Youth Division is necessary for the health, safety, [or] welfare of the child, or any other valid reason articulated by the Department of Human Services Social Work, and appropriate assistance from Child and Family Services cannot be provided to correct or alleviate the situation.

According to the Handbook, "Immediate Danger of Neglect" means that the child's immediate safety is in jeopardy, and the child must be removed because of lack of livable conditions or medical attention. "Otherwise Endangered Neglect" means the safety or welfare of the child who must be removed for any valid reason as determined in consultation with the DHS Worker and the Youth Division Investigator. In all such investigations of abuse or neglect, the handbook points out that it may be necessary to remove the child's clothing to determine the extent of the injuries.

for further injury. Therefore, we conclude that the District's argument that expert testimony was required to prove negligence in this case must fail.

## IV.

The District argues that Harris failed to establish that Tezia's death was a foreseeable consequence of its agent's actions, and therefore, the proximate cause of her injury and death. Proximate cause is "that cause, which in natural and continued sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *Lacy v. District of Columbia*, 424 A.2d 317, 320 (D.C. 1980) (internal quotation omitted). The "defendant need not have foreseen the precise injury, nor should [he] have had notice of the particular method in which a harm would occur, if the possibility of harm was clear to the ordinary prudent eye." *Spar v. Obwoya*, 369 A.2d 173, 177 (D.C.1977) (citing *Kendall v. Gore*, 98 U.S.App. D.C. 378, 387, 236 F.2d 673, 682 (1956)). When the intervening criminal act of a third party causes the injury, the District is liable for negligence only if it should have reasonably anticipated and protected against the danger of that act. *Boykin v. District of Columbia*, 484 A.2d 560, 565 (D.C.1984).[8] Foreseeability of the risk must be more precisely demonstrated because of the extraordinary nature of

criminal conduct. *District of Columbia v. Doe*, 524 A.2d 30, 33 (D.C.1987) (citing *Lacy*, 424 A.2d at 323). "[T]his heightened showing does not require previous occurrences of the particular type of harm, but can be met instead by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act." *Doe*, 524 A.2d at 33. Various factors may be considered by the factfinders as "enhancing the foreseeability of danger...." *Id.* at 34. In *Doe*, probative evidence of a criminally active environment was held to raise a factual question as to the foreseeability of the rape of a fourth grader by an intruder at an elementary school. *Id.*

Similarly, in this case, the likelihood of a further assault upon the children was foreseeable. The factors supporting the foreseeability that harm would come to the two children if left unprotected included: a report from the children's father that they were being abused in their mother's home; a report from the father that both children had bruises on their bodies; a report that both children had scratches on their bodies; a burn on the son's hand; a report of the child that Smith belted them a lot; a bruise on Tezia's back, and other deplorable conditions in the home.[9] These factors could be viewed by reasonable factfinders as enhancing the foreseeability of danger from the children's living situation, thereby creating a duty on the

---

8. Section 448 of the RESTATEMENT (2ND) OF TORTS (1965) states:

The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third*

*person might avail himself of the opportunity to commit such a tort or crime.*

9. Although the detective testified that she did not see either of these marks, Mr. Smith, who was present at the time of the inspection, testified that the marks were present when the detective conducted her interview. The claim that she did not see anything and therefore had no reason to be on notice must fail in light of evidence from which the jury could find that the injuries were present and that the detective should have seen them.

part of District officials to protect them from this type of criminal activity. In short, the likelihood of abuse was not remote in this case. *See Doe, supra,* 524 A.2d at 34. Mr. Harris' complaint was that his children were being abused, and that Tezia was murdered by the alleged abuser. As in *Spar, supra,* "the possibility of harm was clear. . . ." *Id.* at 177. Therefore, we reject the District's argument that proximate cause was not established by the evidence, at least as to Tezia's death.

## V.

▮▮▮ The District challenges the damages awarded. It contends that the case should be reversed on that ground or the verdicts reduced substantially. "An appellate court should order a new trial [for damages] only when the award is contrary to all reason." *Romer v. District of Columbia,* 449 A.2d 1097, 1099 (D.C.1982). It is the jury's province to assess the evidence and determine the amount to award. *See id.* Unless the verdict "evidences prejudice, passion or partiality on the part of the jury or . . . appears to be the result of oversight, mistake, or consideration of an improper element," the appellate court has no basis for overturning it. *Id.*

▮▮▮ As for Tezia, contrary to the District's claims, there was evidence that she suffered conscious pain and suffering as a result of the beating before she was rendered unconscious and died. The doctor so testified. We find no basis to overturn the verdict for Tezia's estate.[10]

▮▮▮ The District argues that reversal of the judgment in favor of Vann is required because the evidence did not establish that his injuries were proximately caused by the District's negligence and that, in any event, the verdict was excessive. A plaintiff is entitled to an award of damages for injuries that were *proximately caused by* a defendant. *Shomaker v. George Washington Univ.,* 669 A.2d 1291, 1296 (D.C.1995); *Bernard v. Calkins,* 624 A.2d 1217, 1220 (D.C.1993). An important component of the claim for damages suffered by Vann was the burn to his left hand alleged (and arguably shown) to have resulted in permanent scarring. However, the record provides no evidence that would have allowed the jury reasonably to decide that this burn was inflicted or occurred *after, rather than before,* the District negligently failed to intervene in the children's lives. Indeed, as the foregoing discussion indicates, appellees' theory was that the pre-existing burn on Vann's hand was one of the indicia of abuse that Detective Burke should have observed but failed to notice on visiting the apartment. This failure to investigate adequately and take action on the children's behalf formed the basis of the District's alleged negligence. Thus, the evidence that Vann's physical injuries were proximately caused by the District's negligence is absent, or at best, highly speculative. Vann contends that he can be compensated for the bruise on his head and emotional injuries suffered as a result of being physically abused and watching his sister's murder.[11] Again,

---

10. We reject the District's challenge to the damage award based upon the testimony of Harris' expert economist as to lost future earnings of Tezia. The District presented its own expert on damages and had an opportunity to challenge the claimed error in Harris' economist's testimony. The resolution of the issue was for the jury, and we see no basis for a new trial on this ground.

11. We have held that "if the plaintiff was in the zone of physical danger and was caused by defendant's negligence to fear for his or her own safety, the plaintiff may recover for negligent infliction of serious emotional distress and any resultant physical injury, re-

there was no evidence of when Vann sustained a head injury or that he witnessed the murder of his sister. Under the circumstances, the claim for damages for Vann was not established.

For the foregoing reasons, the judgment appealed from hereby is affirmed as to the claim on behalf of Tezia's estate and re-

versed as to the claim of Vann against the District.[12]

*So ordered.*

---

gardless of whether plaintiff experienced a physical impact as a direct result of defendant's negligence." *Williams v.. Baker,* 572 A.2d 1062, 1067 (D.C.1990) (en banc). Absent physical injury, to recover for emotional distress, the emotional distress must be "serious and verifiable." *District of Columbia v. McNeill,* 613 A.2d 940, 943 (D.C.1992) (quoting *Jones v. Howard Univ.,* 589 A.2d 419, 424 (D.C.1991)). Vann has not argued this theory on appeal, and apparently did not proceed on

that basis in the trial court. Rather, this claim was to compensate him for a burn and bruise on his head and the emotional distress of watching his sister's death.

**12.** Harris does not object to the entry of judgment for the District on its cross-claim against Smith. That is a matter to be resolved by the trial court.